# EXHIBIT B

# IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY, PENNSYLVANIA

ANNA RUSSO,                          )
                                     )
PLAINTIFF.                           )        No. 10416 of 2019, C.A. ✓ 50 .
                                     )
v.                                   )
                                     )
COUNTY OF LAWRENCE,                  )
PENNSYLVANIA                         )
JOSHUA LAMANCUSA,                    )        JURY TRIAL DEMANDED
individually and in his capacity as  )
LAWRENCE COUNTY                      )
DISTRICT ATTORNEY,

DEFENDANTS.

## COMPLAINT

AND NOW comes Plaintiff, Anna Russo, by and through her attorneys, THE

LINDSAY LAW FIRM, P.C., Alexander H. Lindsay, Jr., Esquire, and J.P. Senich,

Esquire, and files this complaint and avers the following:

## INTRODUCTION

1.      Plaintiff brings this action pursuant to 18 U.S.C § 1962(c) alleging

that the District Attorney of Lawrence County, Joshua Lamancusa, operates a

racketeering enterprise, namely the Special Investigation Unit of the Lawrence

County Drug Task force, that engages in a pattern of racketeering activity,

FILED/ORIGINAL

2021 NOV 29  PM 12: 22



including extortion, Hobbs extortion, wire fraud, and interstate transportation in aid
of racketeering, interfering with interstate commerce, and that unlawfully deprived
Plaintiff Anna Russo of property in violation of her civil and constitutional rights.

## JURISDICTION and VENUE

2.    Venue is proper in the County of Lawrence as this is the county where
the cause of action arose, where the transactions and occurrences took place out of
which the cause of action arose, and where Defendants regularly conducted
activity.

3.    Pursuant to 42 Pa. C.S.A. § 931, this Court has unlimited original
jurisdiction of all actions and proceedings, including all actions and proceedings
heretofore cognoscible by law or usage in the Courts of Common Pleas.
Therefore, this Court has jurisdiction to hear this case.

## PARTIES

4.    Plaintiff, Anna Russo, is an adult individual, and at all times material
resided in Lawrence County, Pennsylvania.

5.    Defendant Lawrence County, Pennsylvania is a Fifth Class County
and political subdivision within the Commonwealth of Pennsylvania, maintaining
an office located at the Lawrence County Courthouse, 430 Court Street, New
Castle, Pennsylvania 16101.



6.    Defendant Lawrence County District Attorney Joshua Lamancusa is an adult individual residing in Lawrence County with a professional address of 430 Court Street, New Castle, Pennsylvania 16101, and at all material times acted under color of law.

7.    District Attorney Lamancusa is sued in his official capacity for declaratory and injunctive relief and in his individual capacity for damages.

## STATEMENT OF FACTS

### *The Enterprise*

8.    The Special Investigation Unit of the Lawrence County Drug Task Force (hereinafter "SIU") was created by and is headed by Defendant Joshua Lamancusa.

9.    The constituent officers of the SIU and the Drug Task Force are chosen by Defendant Lamancusa from the sundry local law enforcement agencies in Lawrence county, including the New Castle Police Department, the Union Township Police Department and certain agents of the Federal Government.

10.    SIU is an exclusive group and reports directly to Defendant Lamancusa.

11.    This enterprise is run out of the District Attorney's Office in Lawrence County Pennsylvania.



FILED/ORIGINAL

2021 NOV 29  PM 12: 22      3

JOSH KLUGE  
PRO AND CLERK

## *The Scheme*

12.    The Defendant Lamancusa, in using the enterprise as heretofore described, engaged in a scheme to defraud and extort individuals in Western Pennsylvania by threatening to file, and filing, criminal charges against said individuals, and leveraging the threat of criminal charges and criminal charges to extract money, property and sexual favors from said individuals.

13.    It was part of the scheme that the Defendant Lamancusa would and did file false criminal charges against individuals and indiscriminately seize property related to the false charges, and demand that the individuals forfeit the right to the property in exchange for lenient treatment with regard to the false charges.

14.    It was part of the scheme that when the individuals refused to forfeit their rights to the property, the Defendant  Lamancusa would and did fabricate evidence to convict the individuals of false criminal charges.

15.    It was part of the scheme that the Defendant Lamancusa would and did develop a set of targeted individuals who owned property which the Defendant sought for himself or his associates, through the forfeiture process.

16.    It was part of the scheme that the Defendant Lamancusa would and did in some cases target individuals for sexual favors.

FILED/ORIGINAL

2021 NOV 29  PM 12: 22

17. It was part of the scheme that the Defendant Lamancusa would and did use confidential informants to "set up" the targeted individuals with fabricated criminal evidence.

18. It was part of the scheme that the Defendant Lamancusa would and did, in some cases, use the confidential informants to "plant" fabricated evidence in or on targeted individual's premises.

19. It was part of the scheme that once the fabricated evidence was planted, the Defendant Lamancusa would and did, in person, lead a group of law enforcement officers who were part of the SIU to arrest the targeted individual.

20. It was part of the scheme that in the course of arresting the targeted individual, the Defendant Lamancusa, using the enterprise, would and did conduct a massive search of the targeted individual's premises.

21. It was part of the scheme that the Defendant Lamancusa would and did seize the property indiscriminately, whether or not the property had anything to do with alleged criminal conduct on the part of the targeted individual.

22. It was part of the scheme that the Defendant Lamancusa would and did seize property such as automobiles and equipment which had substantial value.

23. It was part of the scheme that the Defendant Lamancusa would and did threaten the targeted individuals with long prison terms or arrest and

FILED/ORIGINAL

2021 NOV 29  PM 12: 22    5

J⁻⁻¹ KU⁻ ⁻⁻ ⁻ ⁻⁻⁻)
. PRO ⁻⁻⁻ ⁻⁻⁻⁻⁻

prosecution of their spouses, unless they agreed to waive any claim to the forfeited property.

24.    It was part of the scheme that the Defendant Lamancusa, in certain cases, would then meet privately and alone with the targeted individuals to force them to agree to the aforesaid forfeiture of their property.

25.    It was part of the scheme that the aforesaid private meetings would often be with individuals who had been charged and were represented by counsel and counsel was not present during these private meetings.

### *The Predicate Acts*

#### A.    **The Russo Matter**

26.    Anna Russo, the Plaintiff herein, is the mother of Robert Luptak and owned ACRO Motors in Edinburg, Pennsylvania, an automobile dealership dealing in automobiles which moved or had moved in interstate commerce.

27.    Robert Luptak was the manager of ACRO Motors and as such ran the business.  He received authorization from the Plaintiff Russo to make all purchases and strategic business investments.

28.    Robert Luptak also worked as a drug counselor for drug addicts and was successful getting many drug addicts 100% clean from their addictions.

29.    Prior to October 23, 2014, a confidential information engaged by Defendant Lamancusa or the SIU placed illegal drugs in a 1978 Buick Electra 225 automobile, said informant believing that Robert Luptak owned the vehicle.

30.    In fact, the aforesaid mentioned 1978 Buick Electra 225 automobile was owned by the Plaintiff Russo and was being stored by Russo for wintertime at 214 West Winter Avenue, New Castle, PA.

31.    The Defendant and the SIU confiscated the 1978 Buick Electra 225 automobile without a search warrant procured for the location in which the automobile was located.

32.    Additionally, the aforementioned confidential informant engaged by the Defendant Lamancusa and SIU placed illegal drugs at various outside locations so the aforementioned confidential informant would have easy access to retrieve them unnoticed prior to meeting with Mr. Luptak.

33.    The seized 1978 Buick Electra 225 automobile was never returned to the Plaintiff Russo.

34.    On October 23, 2014, Robert Luptak was staying at a property which was the property of the Plaintiff Russo's parents prior to their death.

35.    On October 23, 2014, it was Robert Luptak's responsibility to care for the property and all of the Russo family heirlooms including valuable articles of property, cash and collectable coins.

7

36.     On October 23, 2014, a search was conducted on the property owned by the Plaintiff Russo and various items were seized regardless of who owned them or whether they had any connection to any allegations of drug charges.

37.     The seizure of property on October 23, 2014 including items owned by the Plaintiff Russo's granddaughters including a 3-wheeler, I Pad, peddle bikes and a child's piggy bank containing money that was being saved for several years by the granddaughter.

38.     The Defendant Lamancuso was at the scene assisting in this search.

39.     On October 23, 2014, Robert Luptak was arrested on drug charges by the New Castle Police Department.

40.     A search was conducted of Robert Luptak's home and many valuable articles of property were seized by police officers who were part of the Enterprise.

41.     Mr. Luptak was kept in a holding cell for 4 hours before Officer Costa, then a member of the SIU brought Defendant District Attorney Lamancusa to speak with him.

42.     While Mr. Luptak was kept in the holding cell, the Defendant Lamancusa was holding the Plaintiff Russo's business cell phone that Lamancusa apparently believed to be Luptak's personal phone.

43.     Defendant Lamancuso called Luptak the "kingpin of the New Castle drug trade" and wanted to know all about the drugs in New Castle.

44.    Prior to questioning Robert Luptak while in custody, Luptak was not given his Miranda warnings until after being questioned by the Defendant Lamancusa.

45.    After hours of questioning from Defendant Lamancusa and officers participating in SIU, Luptak never made any admissions.

46.    In spite of the fact that Luptak never admitted to any wrongdoing, police officers testified falsely concerning the answers given.

47.    In the area where Robert Luptak was questioned, there were recording devices and a camera in the room.  These devises were not used to record the question and answer session conducted by Defendant Lamancusa and the other officers.

48.    In the course of the incustodial interview, the Defendant Lamancusa referenced "stolen tools at the car lot of ACRO Motors".

49.    Defendant Lamancusa asked Robert Luptak if he had a problem letting him "take a look around the car lot for stolen items".

50.    Luptak said that he did not have the keys to get into the lot.

51.    Members of the SIU working with Defendant Lamancusa responded that if Luptak refused to give his consent to a search of the car lot he would, "get a f---ing backhoe and knock down the fence and doors" once they obtained a search warrant.

52.    Attempting to avoid an escalation of the threats against him and the Plaintiff Russo's belongings, Robert Luptak, knowing he had no authority to do without the consent of the Plaintiff Russo, signed a form that gave consent for Defendant Lamancusa to search the car lot.

53.    Members of the SIU executed a search of ACRO Motors on October 23, 2014 without talking to the Plaintiff Russo prior to their arrival at the car lot.

54.    Defendant Lamancusa never produced a search warrant for the Plaintiff Russo for October 23, 2014.

55.    On the evening of October 23, 2014 Plaintiff Russo went to her car lot and spoke with the Defendant Lamancusa.

56.    At that meeting, Lamancusa stated that he and the SIU had a search warrant to be on the premises but no warrant was given to Plaintiff Russo or left on the premises.

57.    Following the search the Defendant Lamancusa, in his official capacity, seized the following:

A.    Approximately fifteen vehicles, titles and deeds to the seized vehicles, titles and deeds to the other vehicles in possession of ACRO Motors;

B.    Approximately $1,500 in petty cash, and other items of property belonging to ACRO Motors and Plaintiff Russo;

C.    $15,498 in bank wraps with time/date stamp and routing numbers that was drawn from ACRO Motors bank account;

D.    $3,268.30, of face value only, of an old coin collection belonging to Plaintiff Russo;

E.    Savings bonds totaling $3,050 in the Plaintiff Russo's name;

F.    Numerous business gift cards totally approximately $2,850;

G.    A large amount of jewelry valued at approximately up to $100,000;

H.    Seven motorcycles;

I.    A large amount of power tools and yard equipment as well as car detailing repair equipment;

J.    Other various items of property belonging to ACRO Motors and Plaintiff Russo.

58.    The vehicles seized by Defendant Lamancusa were among the most valuable vehicles in the possession of ACRO Motors.

59.    The vehicles seized by DA Lamancusa did not belong to Mr. Luptak and were not implicated in any drug investigation.

60.    In the process of seizing the vehicles, members of the SIU caused extensive damage to the Dealership, to wit:

A.    they stomped on, dented and scratched the rooves and hoods of the vehicles;

B.    They ripped out doors, door panels and interiors of the cars;

C.    They damaged an ice cream truck containing a substantial amount of ice cream which resulted in losing $8,000 worth of products and while taking $500 in bills and coins;

D.    They damaged garage doors and office doors;

11

E.    They broke security cameras and cut all wires to security cameras;

F.    They destroyed a large safe;

G.    They took rugs, couches, clothing and shoes and set them on fire in the office;

H.    They determined there were fireworks and they shot them off late at night on October 23 into the morning of October 24, 2014 as neighbors watched;

I.    There was major damage to the property itself by use of heavy equipment which they claimed they were "digging for human remains" without any probable cause to believe there were any human remains on the premises.

61.    Defendant Lamancasa was ordered by the Honorable Dominick Motto to produced evidence for these actions but none was produced.

62.    At a meeting, Defendant Lamancusa stated to Luptak, "I have a proposition for you.   What if I made all charges disappear like they never happened?  Would you like that?   See I'm the guy that can make everything disappear with the push of a pen.  I will do this for you if you just let me keep everything we confiscated.   Why don't you jump onboard so I can welcome you to the family.  This is what we do."

63.    Robert Luptak declined to accept Lamancusa's offer.

64.    Defendant Lamancusa explained that he wanted Luptak to plant drugs or other contraband so that they would appear that the drugs were in the possession

of the targeted individuals; to set somebody up, with a lot of assets, "not someone on the corner selling $20 rocks.   We want the big guys with wealth."

65.    While in the Defendant Lamancusa's presence, members of the SIU working under him stated that they wanted Michael Monsour, the owner of a very large car lot, very bad and Brian Whiting as people he wanted Luptak to "set up."

66.    Robert Luptak's response was, "How can I set someone up if they aren't doing anything illegal?"

67.    The individual speaking to him in front of the Defendant Lamancusa said, "You let us worry about that."

68.    At the aforementioned meeting, Luptak was also offered $100 to cash to make a "buy".

69.    Shortly before Luptak's trial, Luptak who was then represented by counsel, met alone with Defendant Lamancusa in the Defendant Lamancusa office.

70.    Defendant Lamancusa stated, "I will give you one week to decide what you want to do" as he handed Luptak his card with his direct dial number on it stated, "If I don't hear from you I will take that as a no and then I will show you what will happen at trial."

71.    Luptak case proceeded to trial, where he was wrongfully convicted and sentenced to 11 ½ to 23 years in prison.

72.    The vehicles and other seized property remained in the possession of the District Attorney's Office through-out the investigation, prosecution and incarceration.

73.    Plaintiff Russo did not receive her vehicles back from the District Attorney's Office until May or June 2019, almost four years after Mr. Luptak was convicted.

74.    To date, several vehicles wrongfully seized from the Plaintiff are still possessed by the Defendant Lamancusa and SIU along with all titles and paperwork on every motor vehicle ACRO Motors possessed.

75.    Defendant's failed to maintain the vehicles in their possession, and as a result the vehicles returned represent a total loss in value.

76.    The Plaintiff Russo's business of ACRO Motors was shut down permanently.

## B.    The Whiting Matter

77.    Bryan Whiting owned and operated a variety of businesses in Lawrence County, including a construction business, a long term stay hotel, and a roll-off business.

78.     On November 18, 2015, after a traumatic brain injury in a car accident, Bryan Whiting decided to sell fifty percent of his roll-off business to businessmen James Mims and Allen Porter.

79.     In December of 2015 and/or January of 2016, District Attorney Joshua Lamancusa, at the behest of Mr. Mims and Mr. Porter, called the drivers of Whiting's roll-off company to his office to question them and insinuated that Mr. Whiting was breaking the law.

80.     In March of 2017, District Attorney Lamancusa held a meeting in the district attorney's office with Mr. Mims, Mr. Porter, Anthony Carbone, Bryan Whiting, and Mr. Whiting's then attorney—Jason Medure.

81.     Mr. Lamancusa accused Whiting of stealing money from the company and indicated that a large stack of papers on the corner of his desk proved that Whiting had stolen money.

82.     Mr. Lamancusa told Whiting that if he agreed to sell additional portions of his business and agreed to become a 1/3 partner with Mr. Mims and Mr. Porter that Mr. Lamancusa would shred the papers and not charge him.

83.     Whiting did not agree at that time and indicated that he needed to discuss the matter further with his family and attorney, Mr. Medure.

84.      Mr. Lamancusa pressured Whiting through his attorney for Whiting to agree to the proposed deal.

85.    On March 31, 2017, Mr. Whiting received a text message from Mr. Bonner, an attorney affiliated with Mr. Medure, stating, "Per Lamancusa's instructions, paperwork is ready for signature.  Please stop at your convenience, I have to call him by the end of the day."

86.    Mr. Whiting responded by asking, "Per the agreement how much of the company do I own and how much does Mims and Porter own?"

87.    Mr. Bonner replied that out of 500 shares of stock, that Whiting would own 135 shares, Mr. Mims would own 182.5 shares and Mr. Porter would own 182.5 shares.

88.    Mr. Whiting was under the impression, from the meeting with Lamancusa, that he, Mr. Mims, and Mr. Porter would each be 1/3 owners.

89.    Mr. Bonner, via email, suggested Whiting meet with the DA (Defendant Lamancusa) to resolve the issue.

90.    That same day, Mr. Medure (Whiting's attorney) emailed Mr. Bonner and Whiting stating that Whiting was not under duress and that Lamancusa said everyone would "essentially" own 1/3 stock and that it was an estimation.

91.    Mr. Medure also urged Whiting to get a criminal defense attorney if he was not willing to transfer the stock because Lamancusa would continue with the criminal investigation if the deal was not adhered to.

92. Whiting ultimately agreed to transfer a portion of his stock to Mims and Porter

93. Whiting then transferred his remaining shares to his wife, who became a minority shareholder.

94. From the period in which she became a partner, Mr. Mims and Mr. Porter threatened to have charges filed against Mr. Whiting and that he would go to jail if she refused to sell.

95. Mr. Mims and Mr. Porter, at stockholder meetings, threatened Mrs. Whiting that they would have Mr. Whiting put in jail and accused him of stealing money.

96. As a result, Mrs. Whiting left such meetings in tears.

97. Mr. Mims is personal friend of Defendant Lamancusa.

98. In addition to the roll-off business, Mr. Whiting, was the owner of Hudson Suites Extended Stay, an extended stay hotel, located at 2202 West State Street, New Castle, PA 16101.

99. On September 13, 2017, the Lawrence County Drug Task Force conducted a search at Hudson Suites Extended Stay.

100. At approximately 8:51 a.m., Michael Mrozek, a member of the Enterprise, Drug Task Force, arrived at Mr. Whiting's building.

17

101. Mr. Mrozek passed an individual named Chris Murphy, who was staying in Room 103, in the parking lot.

102. Mr. Mrozek then passed through the first and second floors of the building at approximately 8:53 a.m.

103. At 8:58 a.m., Mr. Mrozek left the building.

104. At 9:18 a.m., two other members of the Enterprise, the Drug Task Force, Tommy Costa and Joseph Mangino parked in the rear of the building and came to the front door; hitting the call button but not calling Mr. Whiting.

105. At 9:24 a.m., Mr. Costa and Mr. Mangino left the entry way, but returned two minutes later.

106. Mr. Costa then called Mr. Whiting's cell phone and informed him that he was at the front door.

107. Mr. Whiting allowed Mr. Costa and Mr. Mangino into the building and began to walk with them back to his office.

108. Mr. Costa, however, saw Murphy, who was staying at the hotel, and instructed Mr. Mangino to stay with him.

109. At approximately 10:18, Mr. Costa left the building.

110. Twenty minutes later, Chris Bouye, another member of the Drug Task Force parked at the Dollar General across the street from Hudson Suites and he and Mr. Costa walked back to Hudson Suites.

18

111.    At approximately 10:52 a.m., Mr. Mrozek returned with a search warrant and entered Room 103.

112.    At 10:58 a.m., Mr. Costa and Mr. Bouye exit Room 103 and Mr. Costa pulled Mr. Whiting aside and informed Mr. Whiting that Mr. Lamancusa instructed him that Mr. Whiting was to be placed under arrest and transported to the police station where Mr. Lamancusa would speak with him.

113.    Mr. Whiting was not informed why he was being arrested.

114.    Another officer, Richard Ryhal, then arrived at the scene at 11:00 a.m. while Mr. Whiting was standing with Mr. Costa and Mr. Bouye.

115.    Mr. Costa informed Mr. Ryhal that Mr. Whiting was under arrest and instructed him to take Mr. Whiting to the police station.

116.    Mr. Ryhal inquired as to what Mr. Whiting was being arrest for and Mr. Costa responded that Mr. Lamancusa directed that Mr. Whiting be arrested and to take Mr. Whiting to a holding cell to allow Mr. Lamancusa to interrogate Mr. Whiting.

117.    While on the ride, Officer Ryhal inquired as to why Mr. Whiting was under arrest and when Mr. Whiting indicated that he did not know for what he was arrested for, Officer Ryhal indicated that he would like to know why he was transporting Mr. Whiting and for what he had been arrested.

19

118.    Mr. Whiting was not read his Miranda warnings, but was placed in a holding cell for three to four hours.

119.    Mr. Lamancusa woke up Mr. Whiting and began to yell at Mr. Whiting, saying that he did not know what Mr. Whiting was up to or who he thought he was, but that the ball was in Mr. Lamancusa's court and that Mr. Lamancusa was protected and that Mr. Whiting could call any lawyer from New Castle to Pittsburgh and that if Mr. Whiting cooperates that he would be able to go home but if not that he would go to jail.

120.    Subsequently, Mr. Whiting was interrogated by SIU officers Chris Bouye and Tommy Costa.

121.    The officers wanted to know if Mr. Whiting knew of anybody who sold drugs, if there was drug activity in his building, if he ever saw drugs in his building, and that they had been watching his building for two weeks and asked if he had tipped anyone off.

122.    When Mr. Whiting was finally permitted to leave, Officers Costa and Bouye told Mr. Whiting that nothing had been typed up and that only a few people knew of his arrest and that it was like it never really happened.

123.    In addition, Defendant Costa told Mr. Whiting that he should call and thank Mr. Lamancusa.

124.    Mrozek then drove Mr. Whiting back to Hudson Suites.

125.   Mr. Whiting was never fingerprinted, photographed, or formally charged.

126.   Following the September arrest, tired of Mims' and Porter's threats, fearful of losing her teaching job, and her husband being harassed and the continued threats of potential criminal action being brought against him, Mrs. Whiting, agreed to sell her portion of the roll-off company.

127.   Mrs. Whiting sold the remaining portion of the roll-off company to Defendants Mims and Porter for only $10,000, a fraction of its value.

128.   Mrs. Whiting previously had requested that she be paid $165,000; however, due to the constant threats against her husband, she acquiesced to sell for only $10,000.

129.   Mr. Lamancusa, Mr. Mims, and Mr. Porter, unlawfully conspired to pressure Mr. Whiting and his wife into selling their interest in the business by means of threatening him with criminal action.

130.   In addition, without notice to Mr. Whiting or his wife, the Hudson Suites property was sold at a tax sale on September 29, 2017 to Jim Mims, who then transferred the deed to E.E. Investments LLC, created the date of the tax sale, and whose sole member was Elaine Mansour.

131.   It was not until Martin Luther King Jr. Day 2018 that Mr. Whiting learned that his property had been sold.

132.   On that date, he arrived at Hudson Suites at approximately 2:30 p.m. and was told by Michael Mansour, the son of Elaine Mansour, that Mr. Whiting no longer owned the property and that Mr. Whiting must leave or he would be arrested for trespassing.

133.   Mr. Whiting was not permitted to enter his office, which included lists of business contacts, credit card numbers, social security numbers, and other personal information.

134.   The following day, Mr. Whiting went to the Lawrence County Sheriff and was told that it was illegal not to provide him notice so that he could get his personal belongings.

135.   As a result of Lamancusa and the Lawrence County Drug Task Force, Mr. Whiting was unable to recover his personal belongings from Hudson Suites.

**C.    The Foley Matter**

136.    In November of 2013, Taylor Foley (then seventeen years old) witnessed a Mr. Platt shoot a Mr. Hogue in an apartment that she was in with her son.

137.   Three days after the shooting, Ellwood city police asked Foley to come into the police station to give a statement.

138.   Officers proceeded to beat Foley.

139.   Foley was charged with several crimes and taken to a juvenile facility.

140.    While in the juvenile facility, Foley's mother informed her that CYS had taken her child, T.F.

141.    At Foley's preliminary hearing, a CYS official told her she would get her son back as soon as she testified against Mr. Platt and completed all of their programs.

142.    CYS declined to give T.F. to his father Timothy Rose Jr. or allow Foley to sign over temporary legal custody to her parents.

143.    Foley completed all CYS requirements and testified against Mr. Platt at his preliminary hearing in December 2013.

144.    After being released from the juvenile facility, Foley attended a court proceeding and District Attorney Joshua Lamancusa brought her into his office.

145.    District Attorney Lamancusa asked Taylor F. to work for him as a confidential informant ("CI") and promised Taylor F. that she would get her son back sooner if she worked as a CI.

146.    District Attorney Lamancusa then began to tell Taylor F. how beautiful, smart and conniving she was and that he loved that about her.

147.    District Attorney Lamancusa told Foley, then seventeen, that he always liked her, and that if she did him a favor, he would do a favor for her.

148.    Foley believed that District Attorney Lamancusa was asking for sexual favors in addition to working as a CI.

23

149. Foley informed District Attorney Lamancusa that she was uninterested and he said, "We will see about that."

150. At that point, District Attorney Lamancusa got up and put his hand in Taylor F.'s hair and ran his hand all the way down her back to her buttocks before allowing her to leave.

151. At the end of April 2014, District Attorney Lamancusa began to become more sexual and to compliment Foley's body and again told her that if she would do him a favor he would do her more favors.

152. Foley felt very uncomfortable and told District Attorney Lamancusa that, "I am NO prostitute, I am no whore."

153. District Attorney Lamancusa told Taylor F. that he did not say that nor think that she was either of those things but stated he just "wanted to have a little fun" and that Foley could use his help in return.

154. In February of 2015, Foley was arrested and placed in the Lawrence County Jail for approximately 2 months.

155. The District Attorney's Office seized Foley's parents' car, a television Foley bought for Christmas with the money that her grandmother Peg gave to her, and a computer she bought for Christmas with money from her grandmother Sandy.

156. Although checks and receipts were provided, nothing was ever

returned.

157.    Following this arrest, District Attorney Lamancusa became more brazen knowing that Foley was desperate to get her son back.

158.    District Attorney Lamancusa began to call Foley's cell phone wanting to meet with her, and promising her the return of her son and a good future.

159.    In August 2015, Foley received text messages from Lamancusa that if she did not cooperate with him he would make sure she would go to prison and never see her son again.

160.    Lamancusa also told Foley that if she did him a favor, he would do one for her.

161.    In order to placate Lamancusa, Foley agreed to do him a "favor" although she had no intention of doing so.

162.    District Attorney Lamancusa then dropped all of Foley's drug charges down to disorderly conduct, and arranged for early termination of her probation.

163.    District Attorney Lamancusa also offered to expunge Foley's juvenile record.

164.    Foley did not render any sexual favors onto Lamancusa.

165.    District Attorney Lamancusa became angry and told Taylor F. that she would have to leave the state because he wanted sex in return and did not get it in exchange for getting her off of probation.

166.   At 2:00 a.m. in February 2017, District Attorney Lamancusa arrived at Foley's parent's house in a black SUV with tinted windows, walked into her house without permission, grabbed Foley, and started to kiss her neck all the way down to her inner thigh.

167.   District Attorney Lamancusa made Taylor F. delete messages and also threatened to refile charges if she did not stage messages and act interested because he did not trust her.

168.   Previously, in or around June of 2016, Mr. Platt's murder trial occurred and Foley cooperated and testified.

169.   Almost immediately after, T.F. was given back to Foley.

### *Impact on Interstate Commerce*

170.   Defendant Lamancusa impounding vehicles and titles from ACRO Motors had an impact on interstate commerce because they were removed from the stream of commerce, and, after receiving the vehicles back, Plaintiff Russo was unable to sell them because their value had been depleted since they were returned in poor condition.

171.   Defendant Lamancusa used the enterprise, the SIU to take and impound the vehicles from ACRO Motors.

172.   Defendant Lamancusa's involvement in transfer of Whiting's ownership in his company and transfer of the Hudson Suites Extended Stay,

formerly owned by Mr. Whiting, affected interstate commerce because hotels house people who are traveling from state to state, which the United States Supreme Court has recognized as commerce. *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241 (1964).

173.    Defendant Lamancusa used the Lawrence County Drug Task Force to seize Ms. Foley's parents' car, Foley's computer, and Foley's television which impacts interstate commerce because objects that regularly travel in the stream of commerce and are permitted to be regulated by the commerce clause. *Swift v. U.S.,* 196 U.S. 375, 399 (1905).

## COUNT 1

**Anna Russo v. Joshua Lamancusa, in his official and individual capacity**

**Violation of the Racketeering Influence and Corrupt Organizations Act, 18**

**U.S.C § 1962(c)**

174.    The prior paragraphs are incorporated by reference as if fully set forth herein.

175.    Section 1962 makes it unlawful or anyone to acquire or maintain any interest or control in any enterprise which is engaged in activities that affect interstate commerce through a pattern of racketeering.

176.   "Racketeering" is defined by 18 U.S.C. § 1961 as "any act or threat involving...extortion..."

177.   18 U.S.C. § 1962 requires the acts of racketeering, in this case extortion, be carried out using an enterprise.

178.   18 U.S.C. § 1961 defines an "enterprise" is something that "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

179.   The fifteen vehicles seized by Defendant, and the titles to vehicles not seized, had value at the time of the seizure and were part of Plaintiff's business.

180.   The vehicles and other property seized were not necessary or implicated in the prosecution of Mr. Luptak.

181.   None of the property seized from Plaintiff Russo belonged to Mr. Luptak.

182.   The Supreme Court has ruled that extortion under the RICO Act is "obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats.'" *United States v. Nardello*, 393 U.S. 286, 290 (1969).

183.   Lamancusa seized the vehicles from Plaintiff Russo through his position as District Attorney on the case of Mr. Luptak.

184.   Lamancusa's position made Plaintiff Russo afraid of what would happen to Mr. Luptak (her son) if she did not allow him to take the vehicles into custody for the purpose of the investigation.

185.   The Supreme Court ruled to support a RICO charge the incidents must "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics, and are not isolated events." *H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 469 (1985).

186.   Plaintiff Russo's case is not the only time District Attorney Lamancusa used his position and the Lawrence County Drug Task Force to perpetrate acts of racketeering in violation of 18 U.S.C § 1962(b).

187.   Pursuant to and in furtherance of his fraudulent scheme, Defendant committed multiple related acts of extortion.

188.   The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5). 13.

189.   Defendant Lamancusa has directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

190.    As a direct and proximate result of Defendant Lamancusa's racketeering activities and violations of 18 U.S.C. § 1962(c), the Plaintiff has been injured in her business and property in that:

> A.    The 15 vehicles taken from ACRO Motors that were returned have depleted in value;
>
> B.    There were vehicles that were not returned; and
>
> C.    Various other items heretofore set forth that were wrongfully seized.

191.    Plaintiff, Anna Russo, was the owner of ACRO Motors, a car dealership located at 628 Route 224m Edinburg, PA 16116.

192.    In early 2015, Robert Luptak, Russo's son, was framed by DA Lamancusa on various charges, including drugs.

193.    After Mr. Luptak was convicted, the Office of the District Attorney in Lawrence County refused to return the impounded vehicles and other items wrongfully seized from the Plaintiff Russo.

194.    Almost four years later, in May and June of 2019, the DA's office finally returned some to vehicles to Russo.

195.    The vehicles had not been maintained for years, and the resultant damage rendered them a total loss.

196.    Defendant Joshua Lamancusa was sworn in as the elected district attorney of Lawrence County, Pennsylvania on January 4, 2010.

197.    Since then, Lamancusa has used the Lawrence County Drug Task Force as an enterprise to carry out a pattern of racketeering activity, including extortion, on persons he swore to protect in his role as District Attorney for Lawrence County.

WHEREFORE, Plaintiff respectfully request judgment against the Defendant for monetary and compensatory damages plus court costs, interest, attorneys' fees, and other damages as the Court deems appropriate. A JURY TRIAL IS DEMANDED.


## COUNT 2

**Anna Russo v. Joshua Lamancusa, in his individual and official capacity**

**Violation of 42 U.S.C. § 1983 Deprivation of Property Without Due Process**

198.    The prior paragraphs are incorporated by reference as if fully set forth herein.

199.    Section 1983 provides in pertinent part:

"Every person who, under color of any statute, ordinance, regulation, custom,  or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges or  immunities secured by the Constitution and laws, shall be

31

liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress."

200.    The Fourteenth Amendment provides in relevant part that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law."

201.    The Fourteenth Amendment protects individuals from deprivation of property without due process of law.

202.    The Defendant, the District Attorney of Lawrence County, Lamancusa, and the County of Lawrence County, Pennsylvania are state actors who are subject to the Fourteenth Amendment.

203.    The Defendant Lamancusa and the County of Lawrence County, Pennsylvania acted under color of state law.

204.    The Defendant Lamancusa acted intentionally and with callous disregard for Plaintiffs' clearly established constitutional rights.

205.    The Lamancusa seized approximately fifteen vehicles and other items of property belonging to ACRO Motors and Plaintiff Anna Russo that were not connected to the investigation of Mr. Luptak.

206.    The Defendant Lamancusa acted with deliberate indifference by seizing the above state property of Plaintiff Anne Russo without a valid reason.

32

207.   The Supreme Court held that to have a protected property interest, "a person clearly must have more than an abstract need or desire for it. . ... [The person] must, instead, have a legitimate claim of entitlement to it. . .." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

208.   The 15 vehicles and other items taken from ACRO Motors and the house owned by the Plaintiff Anna Russo who had a "legitimate claim of entitlement to" them because they were a part of her business.

209.   The Supreme Court has ruled that prosecutors are entitled to absolute immunity from Section 1983 claims *only* when performing traditional advocacy functions. *Kalina v. Fletcher*, 522 U.S. 118 (1997).

210.   Seizing property not implicated in an investigation and unrelated to the prosecution of a defendant is not a traditional advocacy function of a prosecutor.

211.   Lamancusa took 15 expensive vehicles as well as substantial items heretofore set forth from Plaintiff Russo's business and house that was occupied by Robert Luptak which were not necessary to the investigation of Mr. Luptak taken without logs of confiscation items logged in confiscation receipts all belonging to Plaintiff Russo.

212.   The Supreme Court cited to *Ames v. Vavreck*, 356 F. Supp. 931 (Minn. 1973) in *Imbler v. Pachtman*, 424 U.S. 409 (1976) which ruled that prosecutors

have no immunity when they act outside of their prosecutorial (or "quasi-judicial) duties.

213.    District Attorney Lamancusa acted outside of the scope of his "quasi-judicial" duties by seizing and refusing to return Plaintiff Anne Russo's property that was unrelated to the prosecution of Mr. Luptak.

214.    Pursuant to 42 U.S.C. § 1983, Defendants are liable to Plaintiff Russo for damages as a result of the deterioration of the vehicles.

WHEREFORE, Plaintiffs respectfully request judgment against the Defendants for monetary and compensatory damages plus court costs, interest, attorneys' fees, and other damages as the Court deems appropriate. A JURY TRIAL IS DEMANDED.

Respectfully submitted:

THE LINDSAY LAW FIRM, P.C.,

Alexander H. Lindsay, Jr., Esq.
Attorney for Plaintiff
Pa. Supreme Court Id. No. 15088

J.P. Senich, Esquire
Attorney for Plaintiff
Pa. Supreme Court Id. No. 317813

110 East Diamond Street, Suite 301
Butler, Pennsylvania 16001
phone: (724) 282-6600

## VERIFICATION

I, ANNA RUSSO, do hereby verify that the statements contained in the foregoing document are true and correct to the best of my knowledge, information, and belief. I understand that false statements made herein are subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

**Anna Russo**

## VERIFICATION

I, TAYLOR R. FOLEY, do hereby verify that the statements contained in the foregoing document are true and correct to the best of my knowledge, information, and belief. I understand that false statements made herein are subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

Taylor R. Foley

## CERTIFICATE OF SERVICE

I, Alexander H. Lindsay, Jr., Esquire, hereby certify that I have the 29th day of November, 2021, served a true and correct copy of the foregoing document on the following by First Class U.S. Mail:

Thomas Leslie
Solicitor
430 Court Street
New Castle, PA 16101

Respectfully submitted:

THE LINDSAY LAW FIRM, P.C.

Alexander H. Lindsay, Jr.

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the United Judicial System of Pennsylvania Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by:

Signature _____

Name:  Alexander H. Lindsay, Jr., Esquire

Attorney No.  (if applicable):  15088

ATTORNEY
NOV 29 2021
SERVING

FILED/ORIGINAL

2021 NOV 29  PM 12: 22

JORI KLAPPURESARD)
PRO / AS CLERK