IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANNA RUSSO and TORRY ARGIRO,      )
                                  )      No.  2:21-CV-01891-RJC
            Plaintiffs,           )
     vs.                          )
                                  )
JOSHUA LAMANCUSA,                 )
                                  )
            Defendant.            )
                                  )      JURY TRIAL DEMANDED

## PLAINTIFFS' RESPONSE TO DEFENDANT'S CONCISE STATEMENT OF MATERIAL FACTS

AND NOW, come the Plaintiffs' by and through their attorneys, Alexander H. Lindsay, Jr., Esquire and the Lindsay Law Firm, P.C. and files the following Response to Defendant's Concise Statement of Material Facts.

1.     The Drug Task Force and the Special Investigations Unit are the same agency. Ex. B, Drew Depo Transcript at 6.

**Admitted.**

2.     The Drug Task Force is a joint task force consisting of law enforcement from different local agencies. Ex. C, Costa Depo Transcript at 34; Ex. B, Drew Depo Transcript at 7-9.

**Admitted.**

3.    The Drug Task Force conducted narcotic investigations. Ex. C, Costa Depo Transcript at 33; Ex. D, Lamancusa Depo Transcript at pp. 59-62.

**Admitted.**

4.    Frank Drew was the Director of the Drug Task Force. Ex. B, Drew Depo Transcript at 6; Ex. D, Lamancusa Depo Transcript at pp. 62; Ex. C, Costa Depo Transcript at p. 9.

**Admitted.**

5.    District Attorney Lamancusa is not involved in the day-to-day operations of the force. Ex. C, Costa Depo Transcript at 44-45; Ex. D, Lamancusa Depo Transcript at p. 66; Ex. B, Drew Depo Transcript at p. 10.

**Denied as stated.**

**The Defendant Lamancusa was involved in the day to day operations of the SIU or "drug task force" to the extent in that he participated directly in searches conducted by the SIU, interrogations by the SIU, meetings with criminal defendants in the presence of SIU members, involvement in the prosecution of individuals investigated and charged by the SIU.   More specifically:**

**a.    The Defendant Lamancusa was present throughout the search of the Plaintiff Russo's house at 218 West Winter Avenue by the SIU on October 23, 2014.   (Exhibit A, Luptak Affidavit. ¶ 15);**

**b.    The Plaintiff Russo's son, Robert Luptak was arrested on October 23, 2014 by police officers who were part of the SIU and taken to a questioning room for four hours.    The Defendant Lamancusa was brought to the room to speak with Luptak.  After hours of questioning from the Defendant Lamancusa and other officers participating in the SIU, Luptak did not make any admissions.   During the course of the interview Luptak gave the Defendant Lamancusa permission to search the Plaintiff Russo's car dealership, ACRO Motors.   (Exhibit A, Luptak Affidavit. ¶ 18-20);**

    **c.    The Defendant Lamancusa participated in a search of ACRO Motors wherein he, in his official capacity, seized many items including 15 vehicles including titles and deeds to other vehicles in the possession of ACRO Motors and various other items of property belonging to the Plaintiff Russo.  (Exhibit A, Luptak Affidavit. ¶ 30-35);**

    **d.     The Defendant Lamancusa met with the Plaintiff Russo's son Robert Luptak at his office in the presence of a member of the SIU wherein the Defendant informed Lutpak that he could make the criminal charges disappear against him if he permitted Lamancusa to keep the Plaintiff Russo's property and if he agreed to "work" for the Defendant by planting drugs and other contraband on innocent persons who had "a lot of assets".  (Exhibit A, Luptak Affidavit ¶ 39-44);**

    **e.    The Defendant Lamancusa filed a "Statement of the District Attorney" in opposition to the Plaintiff Argiro petition for reduction of bail based on allegations that Argiro had committed very serious felonies involving possession with intent to deliver drugs, specifically 932 grams of suspected cocaine and 740 gross grams of suspected heroin, he knew or should have known that the two bags actually contained powder coat paint as evidenced by the drug testing report.  (Exhibit I, Statement of the District Attorney);**

    **f.    The Defendant Lamancusa was directly involved in the investigation by the SIU into the activities of Bryan Whiting.  Whiting was arrested by Detective Richard Ryhal and at the direction of the Defendant Lamancusa he was taken to the New Castle police station where the Defendant Lamancusa dealt with him.   In this interview the Defendant informed Whiting that if he didn't "cooperate" he was going to go to jail and the Defendant had the final decision.   (Exhibit M, Whiting deposition, Page 151-152).**

    6.    Lamancusa has no role in directing the activities of the Drug Task Force/Special Investigation Unit. Ex. D, Lamancusa Depo Transcript at

61-62; Ex. B, Drew Depo Transcript at p.10; Ex. C, Costa Depo Transcript at pp. 45-46.

**Denied.  See response to Paragraph 5 above.**

7.    The officers in the Drug Task Force were paid through their individual departments and reimbursed through the County. Ex B, Drew Depo Transcript at 8-9; Ex. D, Lamancusa Depo Transcript at p. 63.

**Admitted.**

8.    Plaintiff Anna Russo's claim stems from the prosecution of her son, Robert Luptak. ECF No. 29, 2nd Am. Compl. at ¶ 29.

**Denied as stated.  On the contrary, the Plaintiff Russo's claim is related to the prosecution of her son Robert Luptak only to the extent that that prosecution provides the context or framework wherein the Defendant Lamancusa made representations to her son Luptak which form the gravamen of the  Plaintiff Russo's complaint.**

**At a meeting in the course of the Plaintiff Russo's son Robert Luptak's prosecution, the Defendant stated to him, "I have a proposition for you.   What if I made all charges disappear like they never happened? Would you like that?  See I'm the guy that can make everything disappear with the push of a pen.  I will do this for you if you just let me keep everything we confiscated.   Why don't you jump onboard so I can welcome you to the family?  This is what we do." Luptak declined to accept Defendant Lamancusa's offer.**

**The Defendant then explained that he wanted Luptak to plant drugs or other contraband so that it would appear that the drugs were in the possession of targeted individuals; to set someone up with a lot of assets,  "not someone on the corner selling $20 rocks.   We want the big guys with wealth."**

**At this meeting that there were SIU members present with the Defendant Lamancusa and stated that they wanted Michael Mansour, the owner of a very large car lot very bad and Bryan Whiting as people**

the Defendant Lamancusa wanted Luptak to "set up".  When Luptak questioned how he could set someone up if they weren't doing anything illegal, the response from a member of the SIU speaking in front of the Defendant Lamancusa was, "You let us worry about that." Then he was offered $100 in cash to make a "buy". (Exhibit A, Luptak Affidavit,  ¶ 39-44).

The property Lamancusa wished to take belonged to the Plaintiff Russo, not Robert Luptak.  Thus, at this meeting, the Defendant was leveraging a prosecution against Luptak to obtain the Plaintiff Russo's property by extortion.  Furthermore, he was seeking to use the Plaintiff Russo's son Luptak to "set up" or frame innocent individuals by planting evidence which was obstruction of justice.  Whether Luptak was guilty of the underlying offense is of no moment.  At issue is not Robert Luptak's conduct but rather that of the Defendant Lamancusa.

What follows in the Defendant's Concise Statement of Material Facts is directed at the case of *Commonwealth v. Robert Luptak*.   It is obvious the intent of the Defendant Lamancusa is to re-litigate Mr. Luptak's guilt or innocence of the underlying criminal charges.  It doesn't matter.

Therefore, whatever the veracity of the Defendant's statement of fact number 8, it is not material.

9.      On October 22, 2014, a search warrant was issued to search

218 W. Winter Ave., New Castle, where Robert Luptak resided, for

controlled substances and related paraphernalia. Ex. A, 10/22/2014

Search Warrant.

Denied as stated.  This is immaterial as reasons for more specifically set forth in reply to paragraph number 8 above.

10.     The warrant was based upon probable cause from

information obtained from a confidential  informant  and  photos  and

surveillance by Detectives Costa and Ryhal. Ex. A, 10/22/2014 Search Warrant; Ex. FFF, Luptak Search Warrant Photos.

**Denied as stated. This is immaterial as reasons for more specifically set forth in reply to paragraph number 8 above.**

11.     During controlled buys of narcotics and during drug sale activities, Luptak was driving vehicles from ACRO Motors. Ex. FFF, Luptak Search Warrant Photos.

**Denied as stated. This is immaterial as reasons for more specifically set forth in reply to number 8 above.**

12.     ACRO Motors, a used car business, was owned by Anna Russo, but was managed by Robert Luptak. Russo had little knowledge of the day-to-day operations of the business. Ex. M, Russo Depo Transcript at pp. 14-24; Ex. ZZ, Conti Depo Transcript at p. 28.

**Admitted.**

13.    At no point did Josh Lamancusa or any Assistant District Attorney direct the Drug Task Force to take any actions with regard to Robert Luptak. Ex. B, Drew Depo Transcript at 27.

**Denied.   See Plaintiffs' response to paragraph number 5 above.**

14.     The warrant was executed on October 23, 2014 by officers Conti, Ryhal and Kennedy. Ex. B, Drew Depo Transcript at 13-14; Ex. A, 10/22/2014 Search Warrant; Ex. C, Costa Depo Transcript at p. 30; Ex. ZZ, Conti Depo Transcript at pp. 6, 14-16.

**Denied as stated. This is immaterial as reasons for more specifically set forth in reply to paragraph number 8 above.**

15.     Lamancusa was not at Luptak's home on October 23, 2014, and did not participate in the execution of the Oct. 22 warrant. Ex. D, Lamancusa Depo Transcript at 54; Ex. C, Costa Depo Transcript at p. 30.

**Denied.   Defendant Lamancusa was present at the search conducted at 218 West Winter Avenue on October 23, 2014.  He was present throughout the search and was at the scene assisting at the search.   (Exhibit A, Luptak Affidavit, ¶ 14, 15).**

16.     Numerous items of contraband and stolen property were seized by police and inventoried. Ex. I, ACRO Search Warrant - Property; Ex. E, Luptak Trial Transcript at 81.

**Denied.  Various items were seized by the police, regardless of who owned them or whether they had any connection to any allegation of drug violations.  Among the items seized on October 23, 2014 were items owned by Luptak's mother's granddaughter including a 3-wheeler, an I-pad, pedal bike and a child's piggy bank that was being saved for several years by the Plaintiff Russo's granddaughter.   (Exhibit A, Luptak Affidavit, ¶ 13, 14).**

17.     Luptak was taken into custody and charged with delivery of a controlled substance, theft by receiving stolen property, possession of a controlled substance, criminal use of a communication facility, possession with intent to deliver a controlled substance, and possession of drug paraphernalia. Ex. E, Luptak Trial Transcript at pp. 71-88.

**Denied as stated.  It is admitted that Luptak was taken into custody and charged with various criminal offenses.  It is denied that these facts are material in that Luptak's guilt or innocence of the underlying criminal charges are immaterial to this case.**

18.    Luptak was taken to the New Castle Police Station. Ex. C, Costa Depo Transcript at 12.

**Denied as stated.  It is admitted that Luptak was taken to the New Castle Police Station.  By way of further answer, Luptak was kept in a questioning room before Officer Costa, then a member of the SIU brought the District Attorney, the Defendant to speak with him. (Exhibit A, Luptak Affidavit ¶ 18).**

19.    Luptak was presented with and signed a Miranda waiver prior to making a statement. Ex. G, Luptak Miranda Waiver.

**Denied as stated.  It is admitted Luptak was given Miranda warnings.   Luptak was not given Miranda warnings until after being questioned by Defendant Lamancusa.  (Exhibit A, Luptak Affidavit, ¶ 21).**

20.    Following the signing of the waiver, Luptak gave a statement in which he admitted that he would sell drugs in exchange for money and stolen tools. Ex. F, 4/18/2017 Order of Court at 4-5; Ex. C, Costa Depo Transcript at p. 26.

**Denied.    After hours of questioning from the Defendant Lamancusa and officers participating in the SIU, Luptak did not make admissions.  (Exhibit A, Luptak Affidavit, ¶ 22).**

21.    Lamancusa was not present during the interview of Luptak at the New Castle Police Station. Ex. F, 4/18/2017 Order of Court at 4-5; Ex. D, Lamancusa Depo Transcript at 56-57.

**Denied.  As previously stated, Luptak was kept in a questioning room for four hours before Officer Costa, then a member of the SIU brought the District Attorney, the Defendant to speak with him. (Exhibit A, Luptak Affidavit, ¶ 18).  At the interview, the Defendant called Luptak the "kingpin of the New Castle drug trade" and wanted to know all about drugs in New Castle. (Exhibit A, Luptak Affidavit, ¶ 20).**

22.    During the interview, Luptak gave police consent to search

his business, ACRO Motors and officers went to business. See Ex. H, Luptak

Consent to Search.

**Denied as stated.  It is admitted that Luptak signed a form that gave consent to the Defendant Lamancusa to search the ACRO Motors car lot.  It is denied that this consent was given voluntarily.  Members of the SIU, working with the Defendant Lamancusa responded that if Luptak refused to give his consent to the search of the car lot, that Lamancusa would "get a f___g backhoe and knock down the fence and doors" once they had obtained a search warrant.  (Exhibit A, Luptak Affidavit, ¶ 28).  Attempting to avoid the escalation of threats, Luptak signed the form that gave consent for the Defendant Lamancusa to search the car lot.  (Exhibit A, Luptak Affidavit, ¶ 19).**

23.    On October 24, 2014, law enforcement  procured two

additional search warrants for ACRO Motors, located at 5083 West State

Street, Edinburg, PA. Ex. I, ACRO Search Warrant – Property; Ex. J, ACRO

Search Warrant – Human Remains.

**Denied as stated.   The search warrants in question speak for themselves.  Information regarding the prosecution of Robert Luptak is immaterial to this case for reasons as more specifically set forth in Plaintiffs' response to paragraph number 8 above.**

24.    The  first  warrant  sought  to  find  and  seize  stolen  items

on the  ACRO  Motors property,  including stolen tools, sporting equipment,

ATVs, and automobiles. Ex. I, ACRO Search Warrant – Property.

**Denied as stated.   The search warrants in question speak for themselves.  Information regarding the prosecution of Robert Luptak is immaterial to this case for reasons as more specifically set forth in Plaintiffs' response to paragraph number 8 above.**

25.     This warrant was based upon probable cause from controlled buys of narcotics, the results of the search of Luptak's residence on October 22, and Luptak's statements to law enforcement during questioning at the New Castle Police Station on October 23, 2014. Ex. I, ACRO Search Warrant – Property.

**Denied as stated.   The search warrants in question speak for themselves.  Information regarding the prosecution of Robert Luptak is immaterial to this case for reasons as more specifically set forth in Plaintiffs' response to paragraph number 8 above.**

26.     The second warrant sought to locate possible human remains on the property. Ex. J, ACRO Search Warrant – Human Remains.

**Denied as stated.   The search warrants in question speak for themselves.  Information regarding the prosecution of Robert Luptak is immaterial to this case for reasons as more specifically set forth in Plaintiffs' response to paragraph number 8 above.**

27.     This warrant was based on probable cause from text messages obtained from a confidential informant suggesting Luptak had buried a woman who overdosed on the property, the search of Luptak's residence on October 22, Luptak's statements to law enforcement the day prior, and an investigation of the property around ACRO Motors by detectives. Ex. J, ACRO Search Warrant – Human Remains.

**Denied as stated.   The search warrants in question speak for themselves.  Information regarding the prosecution of Robert Luptak is immaterial to this case for reasons as more specifically set forth in Plaintiffs' response to paragraph number 8 above.**

28.    The Drug Task Force executed the search warrant and located additional contraband and stolen property. Ex. C, Costa Depo Transcript at 21-22, 27-28; Ex. B, Drew Depo Transcript at pp. 29-31.

**Denied as stated.   Whatever items of contraband and stolen property were recovered during the search, items belonging to the Plaintiff Anna Russo were seized and held regardless of who owned them or whether they had any connection to any allegation of drug violations.   (Exhibit A, Luptak Affidavit, ¶ 13).   Furthermore, this allegation involving the prosecution of Robert Luptak is immaterial to this case for reasons as more fully set forth in Plaintiffs' answer to paragraph number 8 above.   No warrant was ever given to the Plaintiff Russo, the owner of the ACRO Motors dealership.   (Exhibit A, Lutpak Affidavit ¶ 33).**

29.    New Castle Police executed the warrant with respect to the search for human remains.  Ex. D, Lamancusa Depo Transcript at pp. 85-86; Ex. J, ACRO Search Warrant – Human Remains; Ex. C, Costa Depo Transcript at pp. 18-19.

**Denied as stated.   The search warrants in question speak for themselves.  Information regarding the prosecution of Robert Luptak is immaterial to this case for reasons as more specifically set forth in Plaintiffs' response to paragraph number 8 above.**

30.    Given the presence of this contraband and Luptak's prior narcotics arrest, police seized numerous items, including vehicles, due to concerns they were either stolen or the product of illegal narcotics sales.  Ex. K, Receipt/Inventory of Seized Property.

**Denied.   At no time has the Defendant Lamancusa produced evidence of contraband at ACRO Motors.    It is admitted that the police seized numerous items including vehicles due to concerns that they were either stolen or the product of illegal narcotic sales.    No evidence has ever been produced that these vehicles were either stolen or the product of illegal narcotic sales.    The vehicles seized**

**by the Defendant Lamancusa were among the most valuable vehicles in the possession of ACRO Motors (Exhibit A, Luptak Affidavit, ¶ 35). None of these vehicles belonged to Luptak nor were any of these vehicles implicated in any drug investigation.    (Exhibit A, Luptak Affidavit, ¶ 36).**

31.    Stolen property and firearms belonging to Luptak found in the trunks of ACRO Motor vehicles that were stored at a neighbor's property, which the neighbor gave the police consent to search.  Ex. E, Luptak Trial Transcript at pp. 32, 151-153; Ex. A, 10/22/2014 Search Warrant.

**Denied as stated.  It is admitted that a neighbor gave consent to search a single motor vehicle that was owned by ACRO Motors. This motor vehicle was not on the ACRO Motors premises at the time of the search.   Furthermore, the results of this search and its relevance to the Luptak prosecution is immaterial to the case before the Court for reasons as more specifically set forth in Plaintiffs' response to paragraph number 8 above.**

32.    Police compiled an inventory of all items seized at ACRO motors. Ex. K, Receipt/Inventory of Seized Property.

**Admitted.**

33.    Lamancusa was at ACRO Motors for approximately 30 minutes to an hour on October 24, 2014. Ex. D, Lamancusa Depo Transcript at p. 67; Ex. M, Russo Depo Transcript at p. 108.

**It is admitted that Lamancusa was at ACRO Motors during the search and seizure on October 24, 2014.  It is unclear as to how long he was present at scene.**

34.    Lamancusa was present at ACRO Motors because law

enforcement was looking for a body on the property. Ex. D, Lamancusa

Depo Transcript at 68.

**Denied.  Prior to the search and seizure of ACRO Motors on October 24, 2014, the Defendant Lamancusa met with the Plaintiff Russo's son Robert Luptak at the New Castle Police Department. During the interview, the Defendant Lamancusa referred to "stolen tools at the car lot of ACRO Motors".   (Exhibit A, Luptak Affidavit, ¶ 25).  Lamancusa at that meeting asked Lutpak if he had a problem with "letting him take a look around the car lot for stolen items". (Exhibit A, Luptak Affidavit, ¶ 26).   Luptak was asked by members of the SIU working with the Defendant Lamancusa that if he refused to give his consent to the search of the car lot, that Lamancusa would "get a f___g backhoe and knock down the fence and doors" once they obtained a search warrant.  (Exhibit A, Luptak Affidavit, ¶ 28). At no point in the interview did Lamancusa, or any member of the SIU for that matter, said anything about looking for a body on the property.**

35.    Lamancusa primarily focuses on prosecuting homicide cases

and did not handle drug cases. Ex. D, Lamancusa Depo Transcript at 16.

**Denied.   Whatever the Defendant Lamancusa suggests the he primarily focuses on, he was involved in drug cases germane to the case before the Court.  He was intimately involved in the case against the Defendant's son Robert Luptak for drugs as more fully set forth in Exhibit A, the Luptak Affidavit in its entirety.  Furthermore, he was directly involved in the prosecution of the Plaintiff Argiro in that he opposed Plaintiff Argiro's petition for reduction of bond as more fully set forth in Exhibits H and I.**

36.    At no point during the search of ACRO Motors did Josh

Lamancusa direct law enforcement or tell them what to do. Ex. D,

Lamancusa Depo Transcript at p. 90.

**Denied as stated.  It is admitted that the Defendant Lamancusa stated in his deposition that he did not direct law enforcement or tell them what to do.  Nonetheless, from evidence obtained by the**

**Plaintiffs, it appears Defendant Lamancusa was integrally involved in every aspect of the search of ACRO Motors. It was the Defendant Lamancusa who obtained the consent search the premises from the Plaintiff Russo's son Robert Luptak. (Exhibit A, Luptak Affidavit, ¶ 25, 29). Lamancusa, in his official capacity seized many items at the ACRO Motors on October 23, 2014. (Exhibit A, Luptak Affidavit, ¶ 30 - 35). It was the Defendant Lamancusa who engaged in a conversation with the Plaintiff Russo at the time of the search. (Exhibit C, Russo deposition, Page 102).**

37.    Lamancusa denies being at police department during any meeting with Luptak. Ex. D, Lamancusa Depo Transcript at pp. 73-75.

**Denied as stated. It is admitted that Lamancusa denies being at the police department during any meeting with Luptak. This denial is belied by Luptak's testimony as given in his Affidavit attached as Exhibit A. As stated in that Affidavit, Lamancusa was at the police department during a meeting and in fact questioned him and threatened him. (Exhibit A, Luptak Affidavit, ¶ 18-29).**

38.    Officers Conti and Costa testified that Lamancusa was not at the police department with Luptak. Ex. ZZ, Con8 Depo Transcript at p. 30; Ex. C, Costa Depo Transcript at p.11.

**Denied as stated. It is admitted that Conti and Costa testified that Lamancusa was not at the police department with Luptak. This temony is contradicted by Luptak in his Affidavit as more specifically set forth in Plaintiffs' response to paragraph number 37 above.**

39.    Plaintiffs have no personal knowledge regarding the allegation that Lamancusa or the SIU planted drugs or asked Luptak to be an informant. Ex. M, Russo Depo Transcript at pp.44-45, 115-17.

**It is admitted that the Plaintiff Russo and Argiro were not present when Lamancusa or the SIU planted drugs or asked Luptak to be an informant. The Plaintiff Russo is relying on Luptak's Affidavit which she believes.**

40.    A jury trial with was held from April 18 to 25, 2017 in the Commonwealth v. Robert Luptak.  The case was prosecuted entirely by Assistant District Attorney William Flannery.  Ex. E, Luptak Trial Transcript.

**Denied as stated.  It is admitted there was a jury trial on April 18 to 25, 2017 in the case of Commonwealth v. Robert Luptak.  It is denied that the case was prosecuted entirely by the Assistant District Attorney William Flannery.  The case was based on evidence produced and obtained by the Defendant Lamancusa as a result of his activities on October 23, 2014 as hereinbefore set forth.**

41.    Flannery was not directed by Lamancusa to take any action during the prosecution of Luptak. Ex. R, Flannery Depo Transcript at p. 63.

**It is admitted that is what Mr. Flannery said.**

42.    During the trial, defense counsel asserted that the drugs were planted by a confidential informant to develop probable cause needed for the search warrants.  Ex. E, Luptak Trial Transcript.

**Admitted.**

43.    This defense was rejected by the jury, who ultimately found Luptak guilty of receiving stolen property, firearm charges, and various drug charges. The jury returned the verdict in two hours. Ex. L, Luptak Sentencing Orders; Ex. E, Luptak Trial Transcript at pp. 113-116.

**Denied as stated.  It is admitted that Luptak was found guilty by a jury and sentenced pursuant to that verdict.  It is denied that Luptak's conviction is a material question of whether the Defendant Lamancasa committed the predicate crimes as set forth in the Complaint herein.  As stated in Plaintiffs' response to paragraph number 8 above, it is doesn't matter whether the Plaintiff Russo's son Luptak was found guilty or, in fact was guilty.  The issue before this**

**Court is whether or not there is evidence the Defendant Lamancusa used the prosecution to extort property of the Plaintiff Anna Russo who was not guilty of anything.**

44.     Following Luptak's conviction and sentencing, Russo filed a Motion for Return of Property in the Court of Common Pleas relative on the basis that some of the property seized by police belonged to her. Ex. P, Hearing on Motion for Return of Property; Ex. Q, 3/2/2018 Order of Court.

**Admitted.**

45.     On March 2, 2018, the court conducted a hearing on Russo's motion for return of property. Russo, Luptak, defense attorney Almon Burke and William Flannery took part in the proceedings. Ex. P, Hearing on Motion for Return of Property.

**Admitted.**

46.     Flannery was not directed by Lamancusa to take any action during the forfeiture proceedings involving Luptak and Russo. Ex. R, Flannery Depo Transcript at 63.

**It is Admitted that is what Mr. Flannery said.**

47.     Prior to the hearing, Russo and the Commonwealth had reached an agreement through which several items would be returned. Ex. Q, 3/2/2018 Order of Court.

**Admitted.**

48.     Russo's Motion for Return of Property was denied. It was agreed that the Commonwealth would return all but two vehicles that

were seized – a silver Hyundai Genesis and a Buick Elantra, and any items Russo could identify as hers. Ex. P, Hearing on Motion for Return of Property; Ex. Q, 3/2/2018 Order of Court.

**Admitted.**

49.   Russo consented on the record to the forfeiture of the Buick Electra and Hyundai Genesis. Ex. P, Hearing on Motion for Return of Property.

**Admitted.**

50.   Russo stated on the record during the hearing that she agreed to the resolution. Ex. P, Hearing on Motion for Return of Property.

**Admitted.**

51.   As part of that resolution, Russo agreed that if there was any dispute regarding the return of property, she would file a petition, and a hearing would be held. Ex. P, Hearing on Motion for Return of Property; Ex. Q, 3/2/2018 Order of Court.

**Admitted.**

52.   Flannery made several attempts to reach Russo through her attorney, Mr. Burke, so that she could collect the property the Commonwealth had agreed to turn over to her. Ex. R, Flannery Depo Transcript at pp. 74-75.

**Admitted.**

53.   Flannery sent an email to Burke on July 30, 2018, asking when they could get together to return the Luptak property. Burke

replied on August 1 that he would bring Russo to this office. Ex. S, Flannery Emails.

**Admitted.**

54.    This meeting never happened, as Flannery followed up with another email to Burke on March 6, 2019, stating that the county still had evidence belonging to Russo that she needed to pick up. Ex. S, Flannery Emails.

**Admitted.**

55.    Burke never told Flannery to reach out to Russo, and Russo never reached out to Flannery directly. Ex. R, Flannery Depo Transcript at p. 75.

**Admitted.**

56.    No petition was filed by Russo, Luptak or any attorney after the hearing regarding the return of property. Ex. R, Flannery Depo Transcript at p. 76.

**Admitted.**

57.    No appeal of the court's order was filed by Russo, Luptak, or any attorney regarding the return of property. Ex. R, Flannery Depo Transcript at p. 76.

**Admitted.**

58.    Finally, Frank Drew sent Russo a letter on April 2, 2019, saying that there had been several attempts made to return the vehicles

without success. Ex. T, Drew Letter.

**Admitted.**

59.    Russo did not know that she was supposed to take action to get the cars back between the hearing in March 2018 and receipt of Drew's letter in April 2019. Ex. M, Russo Depo Transcript at p. 73.

**Admitted.**

60.    Eventually, an arrangement was made to have Jacobs Trucking tow the cars back from a private lot in Mahoningtown where they were stored to her property on June 25, 2019. Ex. M, Russo Depo Transcript at 72.

**Admitted.**

61.    Luptak's criminal convictions remain a legal fact. They have not been overturned or vacated.

**Denied.   Before the Court of Common Pleas is a Post-Conviction Relief Act Petition at CP-37-CR-0001073-2014, CP-37-CR-0001075-2014, CP-37-CR-0000512-2015, CP-37-CR-0000902-2015.   The Court of Common Pleas has not at this point rendered a decision on Robert Luptak's petition that seeks dismissal of the charges.   By way of further answer, Luptak's convictions are immaterial in the case before the Court for reasons as set forth in Plaintiffs' response to paragraph number 8 above.**

62.    Russo seeks damages in the form of depreciation in value of the seized vehicles between the time they were ordered returned until she received them a year later. ECF No. 29,

2nd Amend. Compl. at ¶ 270.

**Denied as stated.   Plaintiff Russo is not seeking damages in the**

**form of depreciation in the value of the seized vehicles between the time they were ordered returned until she received them a year later. Plaintiff Russo is seeking damages for the loss of the vehicles that were seized on October 23, 2014.  By the time they were returned in June of 2019 "they were a piece of junk by that time."   (Exhibit C, Russo deposition, Page 70).   Furthermore, the SIU acting under direction of the Defendant Lamancusa, totally destroyed her business. "Well, the damage, they destroyed the office.  They ripped out all of the surveillance cameras and stuff.  They took documents, papers, titled.  They destroyed completely my office. The office is completely destroyed.  And they ripped everything out, you know, wherever they were looking."(Exhibit C, Russo deposition, Page 106).  "There was no business anymore.   It was destroyed."   (Exhibit C, Russo deposition, Page 107).   The used car lot of ACRO Motors is now filled with disabled vehicles that have sat there since October 23, 2014. (Exhibit D, Russo Affidavit, ¶ 23, 24).  Anna Russo cannot do anything with the vehicles because she does not have titles for them.  (Exhibit D, Russo Affidavit, ¶ 25).   These items were not introduced in evidence in the case of *Commonwealth v. Robert Luptak*.  Many of the items seized on October 24, 2014 were not introduced into evidence or returned, including items owned by the Plaintiff Russo's granddaughter, a three-wheeler, and I-pad, a pedal bike and a child's piggy bank containing money that was being saved for several years by the Plaintiff Russo's granddaughter. (Exhibit A, Luptak Affidavit, ¶ 14).**

63.    Russo  has  no  knowledge  of  the  value  of  these

vehicles,  when  they  were impounded,  when  they  were  returned,  nor

what  they  are  worth  now.  Ex.  M,  Russo  Depo  Transcript  at  pp.  147-48.

**Denied.  It is specifically denied that the Plaintiff Russo has no knowledge of the value of the vehicles when they were impounded, or when they were returned, nor what they are worth now.   As stated, they were a "piece of junk at that time." (Exhibit C, Russo deposition, Page 70). Furthermore, the value of the inventory, which was set by Ms. Russo's accountant at approximately $125,000. (Attached as Exhibit E is a chart compiled from the Plaintiff Russo's tax returns).**

Torry Argiro

64.    On September 1, 2019, Argiro's girlfriend Cassandra

Welsh called the  police alleging that Argiro had assaulted her. Ex. U,

Cassandra Welsh Incident Report.

**Denied.  At the outset,  an incident involving Torry Argiro and Cassandra Welsh at the Walmart did not occur on September 1, 2019. It occurred in the late night hours of August 28, 2019 and the early morning hours of August 29, 2019.  (Exhibit F, Argiro deposition, Page 153).   This distinction is crucial in that Plaintiff Argiro's confrontation with SIU member Richard Ryhal occurred on September 1, 2019.   Plaintiff Argiro had two separate and very distinct incidents with law enforcement, the August 28, 2019 incident involving Officer Wickline and the September 1, 2019 incident involving SIU member Richard Ryhal.**

65.   Argiro and Welsh were in the Walmart parking lot in Argiro's

vehicle.  Ex. BBB, Argiro Depo Transcript at pp. 165-166.

**Denied to the extent that the date in question as alleged by the Defendant to be September 1, 2019 when in fact it was in the late night hours of August 28, 2019 and the early morning hours of August 29, 2019.  (Exhibit F, Argiro deposition, Page 153).**

66.    Lamancusa was not aware of any Facebook posts made by

Argiro before this date. Ex. D, Lamancusa Depo Transcript at pp. 90-91.

**Denied as stated.   It is admitted that Lamancusa stated that he was not aware of any Facebook posts made by Argiro before September 1, 2019.   However, this is hard to believe based on the timing the events in late August and early September of 2019. Argiro's post, made on August 26, 2019 accused the Defendant Lamancusa of corruption.   (Exhibit F, Argiro deposition, Page 138). Two days later, on August 28, 2019 he is involved with an incident involving his cocaine supplier, one Cassandra Welsh.   (Exhibit F, Argiro deposition, Page 153).  Cassandra Welsh informed Argiro that she was working with someone in the DA's office, specifically the Defendant Lamancusa.  (Exhibit F, Argiro deposition, Page 149). Three days later, Argiro has a confrontation with SIU member**

**Richard Ryhal. (Exhibit F, Argiro deposition, Page 206, 207). During this confrontation, Richard Ryhal bashed Plaintiff Argiro's face off the desk. (Exhibit F, Argiro deposition, Page 207). During the incident, Ryhal informed Argiro, "we NIK tested your paint, and it tested positive for cocaine." During this second interview, Argiro was charged with a substantial possession of drugs which charges formed the basis for Defendant Lamancusa to oppose Plaintiff Argiro's petition for bond reduction. (Exhibit I).**

67.    Union Township Police Officers Thomas Wickline and Miller responded to the domestic issue and arrived at the parking lot of the New Castle Walmart where both Welsh and Argiro were located. Ex. U, Cassandra Welsh Incident Report; Ex. V, Police Criminal Complaint; Ex. DDD, Wickline Depo Transcript at pp. 6-8.

**Denied as stated. It is admitted that Cassandra Welsh Incident Report of the police criminal complaint alleged that the Union Township Police Officers Wickline and Miller responded to a domestic issue and arrived at the parking lot of the New Castle Walmart where both Welsh and Argiro were located. Nonetheless, Welsh informed Argiro that she was working with someone at the DA's office, specifically the Defendant Lamancusa and that she had been charged with a substance which was in actuality baby powder but she was accused of it being drugs. The charges were eventually dropped because of her cooperation with the DA. (Exhibit F, Argiro deposition, Page 149). Welsh informed Plaintiff Argiro that her cooperation with the District Attorney the Defendant Lamancusa, included sexual activity with the Defendant Lamancusa and that several days after the arrest she performed this sexual activity with Lamancusa to get out of jail. (Exhibit F, Argiro deposition, Page 151, 152).**

68.    During the police's investigation, Welsh told them that Argiro had been selling drugs earlier that day. She retrieved a scale covered with suspected cocaine residue from the center console of Argiro's vehicle and handed it to the officers. Ex. V, Police Criminal Complaint. Ex. DDD, Wickline Depo Transcript at p. 8; Ex. BBB, Argiro Depo

Transcript at p. 172.

**It is admitted that these allegations are contained in the police criminal complaint.**

69.    Based on this information, Officer Wickline of the Union Township Police Department searched Argiro and located additional suspected cocaine residue along with $549 in cash. Ex. V, Police Criminal Complaint.

**It is admitted that this allegation is included in the police criminal complaint.**

70.    Wickline was not acting as part of the Drug Task Force/SIU during the interaction with Argiro and Welsh Ex. BBB, Argiro Depo Transcript at pp. 127-28; Ex. DDD, Wickline Depo Transcript at p. 5.

**Admitted.**

71.    Officers Wickline and Miller then searched the vehicle and discovered a large bag and small bag of suspected cocaine, suspected psychedelic mushrooms inside a bible, and an additional digital scale. Ex. T, Police Criminal Complaint; Ex. L, Union Township Property Record; Ex. DDD, Wickline Depo Transcript at pp. 45-46.

**Admitted.  By way of further answer, there was a small amount of suspected cocaine on Mr. Argiro's person.   (Exhibit P, Wickline deposition, Page 45).**

72.    Argiro was charged with the manufacturing of controlled substance, possession of controlled substance and possession of drug

paraphernalia. Ex. V, Police Criminal Complaint.

**Denied as stated.   Argiro eventually was charged with manufacturing a controlled substance, possession of a controlled substance, and possession of drug paraphernalia.  However, findings suggest these findings were not filed against Argiro the night of his initial action with the Union Township Police.   After the incident the Walmart, the Plaintiff Argiro was taken to the Union Township Police Station and questioned by Officer Thomas Wickline.   (Exhibit F, Argiro deposition, Page 176).   After the Walmart incident and being questioned by Officer Wickline he was taken home.   (Exhibit F. Argiro deposition, Page 67).   Officer Wickline at that time told the Plaintiff Argiro if drugs were found in his vehicle, other than the paint, and if the paint NIK tested positive, "then I will be fine and I will get my vehicle back."  (Exhibit F, Argiro deposition, Page 165). Officer Wickline testified that after the initial interview, "Torry was subsequently released.  I took him back to his mother's residence." (Exhibit P, Wickline deposition, Page 15).**

73.    Following his arrest, Argiro was taken to the Union Township Police Station. He was placed in an interview room and advised of his Miranda rights. Officer Wickline and Detectives Ryhal and Ferrucci interviewed Argiro. Ex. T, Police Criminal Complaint; Ex. W, 9/1/2019 Union Twp Incident Report.

**Denied as stated.   In his Plaintiff Argiro's initial encounter with Officer Wickline, he was taken to the Union Township Police Station. At that point the encounter with Detective Ryhal and Ferrucci did not occur at that time.  It occurred three days later.   (Exhibit F, Argiro deposition, Page 67).  Furthermore, Officer Wickline was not present during the Ryhal and Ferrucci interview with the Plaintiff Argiro. (Exhibit P, Wickline deposition, Page 27, 28).**

74.    Officer Wickline contact Detective Ryhal of the Drug Task

Force because of the suspected drugs found in Argiro's vehicle.   Ex. DDD,

Wickline Depo Transcript at p. 18.

**Denied as stated.   Officer Wickline did not contact Detective Ryhal of the drug task force.  He contacted Detective Ferrucci because Ferrucci was a Union Township Police Officer assigned to the narcotics task force.   (Exhibit P, Wickline deposition, Page 18, 19).**

75.    Lamancusa was not present during Argiro's interrogation. Ex. W,

9/1/2019 Union Twp Incident Report.

**Admitted.**

76.    At no point did Josh Lamancusa or any Assistant District

Attorney direct the Drug Task Force to take any action with regard to Tony

Argiro. Ex. B, Drew Depo Transcript at 27; Ex. R, Flannery Depo Transcript at

p. 63.

**Denied as stated.  Plaintiff Argiro's bond was set at $100,000. (Exhibit F, Argiro deposition, Page 220).  A petition for reduction of bond was filed on September 18, 2019 (Exhibit H).  The Defendant Lamancusa filed a "Statement of the District Attorney" dated the following day and filed on September 23, 2019 opposing the bond reduction.  (Exhibit I).  At his deposition, Defendant Lamancusa stated that he opposed it on the huge quantity of narcotic drugs alleged in Counts 1 and 2 of the criminal complaint which are called the "paint count" charges.  (Exhibit B, Lamancusa deposition 1-27-25, Page 8-10). At the bond hearing the Plaintiff Argirio was informed by Assistant District Attorney Bill Flannery, that the results came back from the crime lab and "it's just paint".  (Exhibit F, Argiro deposition, Page 212, 213).**

77.    During the interview with police, Argrio claimed that the large

bags of suspected drugs were actually paint powder coat for vehicles. Ex.

BBB, Argiro Depo Transcript at p. 79; Ex. DDD, Wickline Depo Transcript at

pp. 13-14.

**Admitted.**

78.    Field tests were conducted of the suspected drugs by

Ryhal which came back positive.   Ex. BBB, Argiro Depo Transcript at pp.

204-206; Ex. CCC, Ryhal Depo Transcript at pp. 9-10.

**Denied as stated.  It is admitted that field tests were conducted of suspected drugs by Ryhal which Ryhal testified came back positive. The Plaintiff Argiro knew the narcotics that were NIK tested was paint and would not give a false position.   (Exhibit F, Argiro deposition, Page 88).   When Argiro walked into the interview room, Ryhal read him his rights and had him initially sign off.  Ryhal told him we "We NIK tested your paint, and it tested positive for cocaine." (Exhibit F, Argiro deposition, Page 207).**

79.    Following the interview, Argiro was taken into custody and

arraigned.  Ex. V, Police Criminal Complaint; Ex. AA, Argiro Sentencing Orders.

**Admitted.**

80.    The large bag of suspected drugs were sent to a

Pennsylvania State Police lab for testing.  Ex. CCC, Ryhal Depo Transcript at

p. 19; Ex. DDD, Wickline Depo Transcript at p. 9.

**Admitted.  By way of further answer, the report from the crime lab dated November 4, 2019 indicated that the drug testing regarding the "paint counts" was "negative".   (Attached as Exhibit O is a copy of that report).**

81.    Argiro's criminal case was prosecuted by ADA William Flannery.

Ex. R, Flannery Depo Transcript at pp. 45-46; Ex. BBB, Argiro Depo

Transcript at p. 230; Ex. D, Lamancusa Depo Transcript at p. 16.

**Admitted.**

82.    Flannery was not directed by Lamancusa to take any action during the prosecution of Argiro. Ex. R, Flannery Depo Transcript at p. 63.

**Admitted to the extent that it is consistent with Mr. Flannery's deposition.**

83.    He was initially given a bond of $100,000 at arraignment; however, Argiro requested that his bond be increased to $250,000 because he "does not want anyone to be able to afford to bond him out" and "want[ed] to detox." This information was recorded in a report by Officer Wickline and noted in the docket information sheet from the Magisterial District Court. Ex. W, Criminal Docket MJ-53302-CR-0000257-2019.

**Admitted to the extent is states what is recorded in a report by Officer Wickline and noted in the docket information sheet from the Magisterial District Court.**

84.    On September 19, Argiro filed a motion for reduced bail. Lamancusa responded asking the court not to grant the bond reduction, stating that Argiro had mental health issues, did not have proof he was employed and given the nature of the charges. Ex. Y, Petition for Bond Reduction.

**Admitted.**

85.    At the time, Argiro was not employed and had mental health issues, including addiction issues.

**Denied as stated. Argiro was employed at the time. (Exhibit F, Argiro deposition, Page 31).**

86. Argiro's bond was reduced by Court Order. Comm. v. Argiro, MJ-53302-CR-0000257-2019, Comm. v. Argiro, CP-37-CR-763-2019.

**Admitted to the extent that Argiro's docket reflects bond was reduced to "unsecured" and Argiro was released to house arrest.**

87. The Court, not Lamancusa nor any prosecutor, made the determination regarding Argiro's bail. Id; Ex. Y, Petition for Bond Reduction.

**Denied as stated. While the Court made the ultimate decision regarding Argiro's bail, certainly the District Attorney Office had a significant input the Court. (Exhibit "I").**

88. In December 2019, Plaintiff posted bond and the Court released Argiro from jail pending trial and was confined to house arrest so that he could get drug and alcohol treatment. Ex. BBB, Argiro Depo Transcript at pp. 236-237.

**Admitted.**

89. Testing conducted on the powder coat found in Argiro's vehicle came back negative on November 4, 2019, but this was never shown to Lamancusa. Ex. D, Lamancusa Depo Transcript at pp. 14-15.

**It is admitted that testing was performed on the powder coat found in Argiro's vehicle and it came back negative on November 4, 2019. It is also admitted that Lamancusa said this was never shown to him. Of course, what Lamancusa knew and when he knew it remains an issue that will have to be determined at trial.**

90. On February 13, 2020, the suspected psilocybin and small bag of suspected cocaine were sent to the Pennsylvania State

Police lab for testing. Ex. Z, Bureau of Forensic Services Drug Identification.

**Admitted.**

91.    Testing on other substances found in Argiro's vehicle came back positive for psilocybin and cocaine. Ex. Z, Bureau of Forensic Services Drug Identification.

**Admitted to the extent the suspected psilocybin and small bag of cocaine tested positive for psilocybin and cocaine.   It is denied that other substances found in Argiro's vehicle came back positive for psilocybin and cocaine in that these were the only two substances tested.**

92.    While in jail In October 2019 , Argiro placed a call to his mother, during which he said he was going to "take the life" of Detective Richard Ryhal's daughter.  Ex. BBB, Argiro Depo Transcript at pp. 224-225; Ex. AAA, Argiro Jail Telephone Call.

**Admitted.**

93.    Argiro's mother became so upset at Argiro's statement that she admonished her son and then hung up the phone without further engaging.  Ex. AAA, Argiro Jail Telephone Call.

**Admitted.**

94.    As a result of these statements, Argiro was charged by Detective Burker with witness intimidation in addition to the charges stemming from his September 1 arrest. Ex. AA, Argiro Sentencing Order; Ex. BBB, Argiro Depo Transcript at p. 225;   Ex. CCC, Ryhal Depo Transcript

at pp. 30-31.

**Admitted.**

95.    Detective Burker was not a member of the Drug Task Force.  Ex. CCC, Ryhal Depo Transcript at pp. 30-31.

**Admitted.**

96.    On October 16, 2020, the Union Township Police Department obtained a search warrant to search Argiro's iPhone. Ex. BB, 10/16/2020 Search Warrant.

**Admitted.**

97.    The search of Argiro's cell phone uncovered multiple text messages and photos related to the sale of narcotics. Ex. AA, Argiro Texts and Photos; Ex. WW, 9/1/2019 Union Twp Incident Report.

**It is admitted that the incident report of Union Township states that.**

98.    On October 16, 2020, Plaintiff's drug charges were reduced to eliminate the manufacturing charge. Ex. D, Lamancusa Depo Transcript at pp. 18-20; Ex. AA, Argiro Sentencing Orders.

**Denied as stated.  It is denied that the Plaintiff Argiro's "drug charges" were reduced.   The criminal complaint essentially had two discreet offenses.   The first two counts involve serious felonies involving possession with intent to deliver, 932 of suspected grams of suspected cocaine and 740 gross grams of suspected heroin.   These two counts involved paint powder of the Plaintiff Argiro.   These charges were the result of Ryhal's testing which occurred on September 1, 2019.  The second two counts of the complaint go back to the initial encounter that the Plaintiff Argiro had with Officer Wickline.   The third count of the complaint refers to a plastic bag containing approximately 1 gram of suspected cocaine.  The fourth**

**count involves possession of drug paraphernalia. These two counts are referred to as the "paraphernalia counts". The "paint counts" and the "paraphernalia counts" are discreet and separate offenses. (Exhibit G, Argiro Criminal Complaint). It was the "paint counts" that formed the basis for Defendant Lamancusa's opposition to the reduction of bond. A report from the crime lab dated November 4, 2019 indicated that the drug testing regarding the "paint counts" was negative. (Exhibit O). In light of the fact that the District Attorney's office was well aware that the reason for the District Attorney's opposition to bond reduction was the "paint counts" and that the Pennsylvania Crime Lab had determine that the powder was in fact "paint powder" and not heroin or cocaine the Commonwealth continued to pursue the "paint counts" charges and the Plaintiff Argiro's bond continued. (Exhibit F, Argiro deposition, Page 256). Thus, the Plaintiff Argiro's drug charges were not "reduced" at the time of his change of plea in March of 2021. The false charge against Argiro wasn't reduced, it was eliminated as it should have been eliminated in November of 2019.**

99.    On March 8, 2021, Argiro pled guilty to the charges of

Possession of a Controlled Substance pursuant to 35 Pa.C.S.A. Sec. 780-

113(a)(16) and pled no contest to a witness intimation charge. Ex. BB,

Argiro Sentencing Orders; Ex. GGG, Argiro Sentencing Transcript.

**Admitted. Argiro pleaded guilty to charges involving counts 3 and 4 of the criminal complaint, the "paraphernalia counts". On the theory of "constructive possession". (Exhibit F, Argiro deposition, Page 242). He pleaded guilty because he was guilty.**

100.  Argiro's vehicle admittedly had drugs in it. Ex. BBB, Argiro Depo

Transcript at pp.247-248; Ex. V, Police Criminal Complaint.

**Admitted.**

101.  He was sentenced to time served and paroled forthwith. Ex. AA,

Argiro Sentencing Orders.

**Admitted.**

102.    Argiro's conviction has not been overturned, reversed, or otherwise vacated. Ex. BBB, Argiro Depo Transcript at pp. 246, 251.

**Admitted.  By way of further answer, the Plaintiff Argiro did not appeal the same nor are there any grounds for him to appeal the same.**

WHITING

103.  Bryan Whiting  initiated a lawsuit at Whiting v. County of Lawrence, et al., 18-cv-1398. The allegations relating to Foley in this Second Amended Complaint are essentially "copied and pasted" from the Complaint in that federal matter.  (2:18-cv-1398, ECF No. 1).

**Admitted.**

104.  Extensive discovery was conducted  in the  Whiting lawsuit. Ex.  DD, County Defendants' CSMF - Whiting.

**Admitted.**

105.  Prior to November 2015, Bryan Whiting was the sole owner of Whiting Roll-Offs, LLC. Ex. EE, Whiting Depo Transcript at p. 74.

**Admitted.**

106.  Bryan Whiting was the owner of Hudson Suites Extended Stay Motel ("Hudson Suites") in New Castle, Pennsylvania. Ex. EE, Whiting Depo Transcript at p. 21.

**Admitted.**

107.  Bryan Whiting took out personal loans from his friends and business associates. Ex. EE, Whiting Depo Transcript at pp. 79-80, 91-92,

99-100, 228, 279.

**Admitted.**

108.   In November 2015, Bryan Whiting approached James Mims seeking to sell a portion of his roll-off business to Mims or enter into real estate investments together for financial help. Ex. EE, Whiting Depo Transcript at pp. 77, 207; Ex. FF, Mims Depo Transcript at pp. 7-8; Ex. GG, Porter Depo Transcript at pp. 5-6.

**Admitted.**

109.   Jim Mims told Bryan Whiting that he would be interested in buying into the roll- off business if Allen Porter was involved. Mims and Porter had previously been involved in real estate transactions together and believed that the roll-off business would be a good fit for them, given their real estate investment properties. Ex. EE, Whiting Depo Transcript at pp. 77-79; Ex. FF, Mims Depo Transcript at pp. 7-8; Ex. GG, Porter Depo Transcript at pp. 5-6.

**Admitted.**

110.   During negotiations related to a sale of a portion of the roll-off business, Bryan Whiting was represented by attorney Jason Medure. Ex. EE, Whiting Depo Transcript at p. 79; Ex. FF, Mims Depo Transcript at p. 17.

**Admitted.**

111.   On November 15, 2018, Mims, Porter and Bryan Whiting

entered into an Asset Purchase Agreement setting forth that Mims and Porter purchased 50% of the roll-off business for $225,000.00. Bryan Whiting retained the remaining 50% ownership. Ex. HH, Asset Purchase Agreement dated 11/15/18.

**Admitted.**

112.    Based on the Asset Purchase Agreement, Mims owned 125 shares of Whiting Roll- Offs, Inc., Porter owned 125 shares and Bryan Whiting owned 250 shares. Id.

**Admitted.**

113.    The District Attorney asked Allen Porter if they had any evidence to support their accusation of Bryan Whiting stealing funds from the business. Allen Porter stated that he would get together the records. Ex. II, Lamancusa Depo Transcript – Whiting matter at pp. 8-10; Ex. FF, Mims Depo Transcript at pp. 9-10.

**It is admitted that this is consistent with Defendant Lamancusa's testimony.**

114.    The District Attorney conducted interviews of two drivers from Whiting Roll-Offs who indicated that Bryan Whiting was providing roll-off services in exchange for payments of his personal debts. Ex. II, Lamancusa Depo Transcript – Whiting matter at pp. 11, 15-16; Ex. JJ, DA's Notes.

**It is admitted that this is consistent with Defendant Lamancusa's testimony.**

115.    The District Attorney determined that approximately $44,000 of funds were diverted from the business by Bryan Whiting. The District Attorney believed this this constituted theft. Ex. II, Lamancusa Depo Transcript – Whiting matter at pp. 18-20, 24; Ex. JJ, DA's Notes.

**It is admitted the Defendant Lamancusa testified that he determined that approximately $44,000 were diverted from business by Bryan Whiting and that he believed this constituted theft. It was Bryan Whiting position that he had been instructed by Mims and Porter to pay certain items that were not in the corporation records. For example, Whiting was paying some of the drivers cash over a six month period. (Exhibit M, Whiting deposition, Page 94, 95). Whiting insisted, "I wasn't doing anything wrong." (Exhibit M, Whiting deposition, Page 87).**

116.    Bryan Whiting admitted that he had collected cash payments or credit card payments for services rendered by the roll-off business and did not always deposit them into the appropriate Whiting Roll-Offs' business bank account. Ex. EE, Whiting Depo Transcript at pp. 269-73.

**Admitted.**

117.    The District Attorney contacted Bryan Whiting's attorney Jason Medure to attempt to set up a meeting with Bryan Whiting relating to his belief that Whiting had misappropriated funds from the roll-off business. Ex. EE, Whiting Depo Transcript at p. 293; Ex. II, Lamancusa Depo Transcript – Whiting matter at p. 17; Ex. KK, Medure Depo Transcript at pp.18-19; Ex. LL, Medure Texts.

**Admitted to the extent that it is consistent with what was said during the depositions.**

118.    Jason Medure contacted Bryan Whiting with the time and date of a meeting to be held at the District Attorney's Office relating to Mims and Porter's complaint that he was stealing funds from the roll-off business. Bryan Whiting agreed to attend the meeting. Id.

**Admitted to the extent that it is consistent with what was said during the depositions.**

119.   On March 23, 2017, Bryan Whiting, Jason Medure, Jim Mims, Allen Porter, and the District Attorney attended a meeting at the District Attorney's Office.   Ex. EE, Whiting Depo Transcript at pp. 88-89; Ex. II, Lamancusa Depo Transcript – Whiting matter at p. 9; Ex. KK, Medure Depo Transcript at p. 20.

**Admitted.**

120.    During the meeting, the District Attorney stated that he received a complaint and evidence demonstrating that Bryan Whiting had stolen funds from the business. Ex. EE, Whiting Depo Transcript at pp. 102-05; Ex. II, Lamancusa Depo Transcript – Whiting matter pp. 17-19; Ex. FF, Mims Depo Transcript at p. 20; Ex. KK, Medure Depo Transcript at pp. 21-22.

**Admitted.**

121.    The District Attorney indicated that if the business partners could work out an agreement amongst themselves, he would not have recommended that charges be filed against Bryan Whiting for his theft. Ex.

EE, Whiting Depo Transcript at pp. 120-21; Ex. II, Lamancusa Depo Transcript

– Whiting matter at pp. 22-23; Ex. FF, Mims Depo Transcript at p. 21; Ex.

KK, Medure Depo Transcript at p.22.

**Denied as stated. There was a discussion that if the ownership interest between Whiting and his two partners, Mims and Porter, were adjusted there would be no criminal charges. Whiting took that to be a threat. (Exhibit M, Whiting deposition, Page 104). According to Whiting, "Josh was writing figures and Jim were writing figures and figuring out when we were all sitting at the table and breaking down the shares or whatever. I don't know the exact conversation but I know Josh had said, if you guys all agree we go to a third partner, that stack of paper (referring to the supposed evidence in the case) would go to the shredder. (Exhibit M, Whiting deposition, Page 108, 109).**

122.    Jason Medure and the District Attorney left the room and

allowed the business partners to discuss the matter. Ex. EE, Whiting Depo

Transcript at p. 121; Ex. II, Lamancusa Depo Transcript – Whiting matter

at pp. 20-21; Ex. FF, Mims Depo Transcript at pp. 22-24; Ex. GG, Porter

Depo Transcript at p. 13; Ex. KK, Medure Depo Transcript at p. 22.

**Admitted to the extent that it is consistent with what was said during the depositions.**

123.    When Jason Medure and the District Attorney returned to

the room again, the business partners indicated that they came up with a

proposal in which Bryan Whiting would give a portion of his shares to Jim

Mims and Allen Porter in exchange for the missing funds. Ex. II, Lamancusa

Depo Transcript – Whiting matter at p. 21; Ex. FF, Mims Depo

Transcript at pp. 22-24; Ex. GG, Porter Depo Transcript at pp. 16-17; Ex. KK, Medure Depo Transcript at p. 22.

**Admitted to the extent that it is consistent with what was said during the depositions.**

124.    Mims, Porter and Bryan Whiting agreed that Michael Bonner, Jason Medure's law partner, would draft the agreement to memorialize the agreement between the parties to transfer the shares. Ex. KK, Medure Depo Transcript at p. 23.

**Admitted to the extent that it is consistent with Medure said during the deposition.**

125.    With information provided by Jim Mims, Bonner drafted an agreement and provided it by email to Bryan Whiting to sign. Ex. EE, Whiting Depo Transcript at pp. 117-118; Ex. KK, Medure Depo Transcript at p. 23; Ex. MM, Bonner Email.

**Admitted.**

126.    Bryan Whiting believed the terms of the agreement written by Michael Bonner were not consistent with his discussions with his business partners during the meeting at the District Attorney's Office and responded to Michael Bonner that he felt pressured to enter into the agreement. Ex. MM, Bonner Email; Ex. LL, Medure Texts.

**Admitted to the extent that it is consistent with what was said during the depositions.**

127.    Jason Medure responded to Bryan Whiting's complaints stating that there was no duress being placed upon him, the agreement represents what was agreed to at the District Attorney's Office and that Bryan Whiting should consult with a criminal defense attorney, if necessary, because Medure does not practice criminal law. Ex. EE, Whiting Depo Transcript at pp. 117-18; Ex. KK, Medure Depo Transcript at p. 26; Ex. MM, Bonner Email; Ex. LL, Medure Texts.

**Admitted to the extent that it is consistent with what was said during the depositions.**

128.    Upon Medure's suggestion, Bryan Whiting hired Brad Olson as his criminal attorney. Ex. EE, Whiting Depo Transcript at pp. 123; Ex. N, Olsen Depo Transcript at p. 17.

**Admitted to the extent that it is consistent with what was said during the depositions.**

129.    Brad Olson contacted the District Attorney to set up a meeting to review the evidence the District Attorney had relating to the accusations against Bryan Whiting relating to his theft from Whiting Roll-Offs, Inc. Ex. EE, Whiting Depo Transcript at p. 123; Ex. II, Lamancusa Depo Transcript – Whiting matter at pp. 29-30, 70-71; Ex. JJ, DA's Notes; Ex. N, Olson Depo Transcript at pp. 18-21.

**Admitted to the extent that it is consistent with what was said during the depositions.**

130.    On April 7, 2017, Brad Olson met with the District Attorney

at  the  District Attorney's Office and reviewed the evidence. Id.

**Admitted to the extent that it is consistent with what was said during the depositions.**

131.    Upon reviewing the evidence the District Attorney had relating to Bryan Whiting and Whiting Roll-Offs, it was Brad Olson's impression that evidence of theft existed. Ex. II, Lamancusa Depo Transcript – Whiting matter at pp. 70-81; Ex. JJ, DA's Notes; Ex. N, Olson Depo Transcript at pp. 18-22.

**Admitted to the extent that it is consistent with what was said during the depositions.**

132.  Brad Olson counseled Bryan Whiting to enter into an agreement with Mims and Porter to avoid criminal charges for theft. Ex. EE, Whiting Depo Transcript at p. 124.

**Admitted.**

133.    Brad Olson testified that it is common in his criminal defense practice to meet with District Attorneys and Assistant District Attorneys to negotiate restitution in lieu of criminal charges in Lawrence County and the other jurisdictions in which he practices. Ex. N, Olson Depo Transcript at pp. 11-133.

**Admitted to the extent that it is consistent with what was said during the depositions.**

134.    Brad Olson prepared a Stock Transfer Agreement in which the shares of Whiting Roll-Offs would be split in equal thirds amongst Jim

Mims, Allen Porter and Bryan Whiting, and they signed the agreement on April 24, 2017. Ex. N, Olson Depo Transcript at p. 24; Ex. NN, Transfer Agreement.

**Admitted to the extent that it is consistent with what was said during the depositions.**

135.    Brad Olson relayed to the District Attorney that the parties had come to an agreement relating to a transfer of shares of Whiting Roll-Offs, Inc. Brad Olson had no further communications with the District Attorney on the matter. Ex. N, Olson Depo Transcript at pp. 26-27.

**Admitted to the extent that it is consistent with what was said during the depositions.**

136.    Because Jim Mims and Allen Porter were satisfied that they received restitution for funds Bryan Whiting took from Whiting Roll-Offs, Inc. they were no longer complaining witnesses, and the District Attorney did not pursue charges against Bryan Whiting. The District Attorney had no further communications with Mims, Porter, Olson, Medure or Bryan Whiting regarding the roll-off transaction or had any further knowledge of the ownership of Whiting Roll- Offs, Inc. Ex. EE, Whiting Depo Transcript at pp. 105-07; Ex. II, Lamancusa Depo Transcript – Whiting matter at p. 28; Ex. FF, Mims Depo Transcript at p. 32; Ex. KK, Medure Depo Transcript at p. 29; Ex. N, Olson Depo Transcript at pp. 26-27.

**Admitted to the extent that it is consistent with what was said during the depositions.**

137.    After Bryan Whiting had transferred a portion of his shares to Jim Mims and Allen Porter, Bryan Whiting sought to transfer his remaining ownership to his wife, Michelle Whiting, because Bryan Whiting testified that he felt he could no longer work in the business. Mims and Porter agreed to the transfer. Brad Olson drafted an agreement to transfer the shares from Bryan to Michelle, who signed the agreement on April 24, 2017. Ex. EE, Whiting Depo Transcript at p. 130; Ex. OO, Michelle Whiting Depo Transcript at pp. 15-16, 41-43; Ex. N, Olson Depo Transcript at pp. 14, 26; Ex. PP, Transfer to M. Whiting Documents.

**Admitted.**

138.    Upon Michelle Whiting's ownership, Jim Mims and Allen Porter realized that Bryan Whiting had previously defaulted on financial obligations of the roll-off business. Ex. OO, Michelle Whiting Depo Transcript at pp. 18-19; Ex. FF, Mims Depo Transcript at p. 28; Ex. GG, Porter Depo Transcript at pp. 20-21.

**Admitted to the extent that it is consistent with what was said during the depositions.**

139.    Michelle Whiting testified that Jim Mims and Allen Porter "threatened" that they would file criminal charges against Bryan Whiting related to these undisclosed debts. Her basis of this knowledge came from Bryan Whiting. Michelle Whiting testified that the District Attorney did

not "threaten" any criminal charges relating to Bryan Whiting's now discovered debts. There is no evidence that the District Attorney received any complaints related to the newly discovered debts by Bryan Whiting. Ex. OO, Michelle Whiting Depo Transcript at pp. 16-17.

**Admitted.**

140.    When additional business debts accrued by Bryan Whiting became due by Whiting Roll-Offs, Inc. and without the additional funds to satisfy the debts, Michelle Whiting offered to sell her shares of stock in the business to Allen Porter and Jim Mims for $10,000. Ex. OO, Michelle Whiting Depo Transcript at pp. 17-19; Ex. QQ, Transfer from M. Whiting Documents.

**Denied as stated.  According to Michelle Whiting there were constant meetings with Mims and Porter and she either had to come up with more money or lose shares of the business to cover a debt of Bryan's.  If she didn't pay it, Bryan would be charged.  Every time there was a meeting, there was to be more money from Michelle Whiting.  (Exhibit N, Michelle Whiting deposition, Page 18).  The contract that was originally signed when she became a partner valued her one share of the business at $165,000.  (Exhibit N. Michele Whiting deposition, Page 19).   Michelle Whiting testified that she sold her one share valued at $165,000 to Mims and Porter for $10,000.  "It was come up with the $10,000 or take the $10,000 and be gone."  (Exhibit N, Michelle Whiting deposition, Page 87).**

141.    Brad Olson prepared documents to transfer Michelle Whiting's shares to Mims and Porter for $10,000 in exchange for the outstanding debts owed by the business and accrued by Bryan Whiting. Mims, Porter and Michelle Whiting signed the document on October 18, 2017. Ex. QQ, Transfer from M. Whiting Documents.

**Admitted.**

142.     Michelle Whiting was advised by her counsel, the Law Offices of Joel Sansone, to transfer her interest in the roll-off business. Ex. OO, Michelle Whiting Depo Transcript at pp. 80-81, 87.

**Admitted.**

143.     Michelle Whiting was initially satisfied with the deal she made to sell her shares of Whiting Roll-Offs, Inc. She became dissatisfied when she told Bryan Whiting she sold the shares and he became angry. Ex. OO, Michelle Whiting Depo Transcript at pp. 87-89, 120.

**Admitted.**

144.     Michelle Whiting had no interactions with the District Attorney on any matters referenced in the Complaint. Ex. OO, Michelle Whiting Depo Transcript at p. 14.

**Admitted.**

145.     "The Drug Task Force was issuing a warrant upon a known drug dealer who was stay at the Hudson Suites." Ex. II, Lamancusa Depo Transcript – Whiting Matter at p. 33.

**Admitted.**

146.     "Whiting tipped off the target of the warrant before the police entered the property which put the police executing the warrant in danger. This action amounted to probable cause for obstruction of justice, tampering and conspiracy and Whiting was

arrested. Id.

**It is admitted that Lamancuso so testified.**

147.   "Lamancusa asked Whiting to be a confidential information in exchange for those charges being dropped." Id. at p. 39.

**Admitted.**

148.   The District Attorney did not charge Bryan Whiting because he agreed to provide information to the police and because prosecuting Bryan Whiting would have required cutting a deal with the Target in exchange for his testimony. Ex. II, Lamancusa Depo Transcript – Whiting matter at pp. 39-40.

**It is admitted that Lamancusa so testified.   The District Attorney did not charge Bryan Whiting because the ownership interested in Whiting Roll-Offs LLC was adjusted so that Lamancusa's friends would own a greater share of the corporation. (Exhibit M, Whiting depositions, Pages 104, 105, 108, 109).**

149.   Bryan Whiting was never charged with a crime by the District Attorney, Lawrence County, Union Township police or New Castle police. Ex. EE, Whiting Depo Transcript at p. 135.

**Admitted.**

150.   Bryan Whiting met with the District Attorney in 2017 or 2018, after the arrest, to complain about what Bryan Whiting thought was criminal activity relating to a tax sale of one of his properties and other issues. Ex. EE, Whiting Depo Transcript at pp. 52-55; Ex. II, Lamancusa

Depo Transcript – Whiting matter at pp. 7-8.

**Admitted.**

151.    The District Attorney indicated that he would review the information/complaint by Whiting and turn it over to the Attorney General if he believed evidence of criminal activity existed. Ex. EE, Whiting Depo Transcript at pp. 55-56.

**Admitted.**

152.    Jim Mims purchased property through a public tax sale conducted by Lawrence County and the District Attorney's Office. Ex. RR, Deed Recording.

**Admitted.**

153.    The District Attorney's only involvement in that tax sale was that he was responsible for signing the deeds for property purchased through these public tax sales from seized property. Ex. II, Lamancusa Depo Transcript – Whiting matter at pp. 56-58; Ex. RR, Deed Recording.

**Admitted.**

<u>Taylor Foley</u>

154.    Taylor Foley initiated a lawsuit at Taylor F. v. Lawrence Cnty. et al., 18-cv-1397. The allegations relating to Foley in this Second Amended Complaint are essentially "copied and pasted" from the

Complaint in that federal matter. (2:18-cv-1397, Complaint.)

**It is admitted that Taylor Foley initiated a lawsuit at Taylor F. v. Lawrence Cnty., et al. 18-cv-1397.   The allegations contained in that complaint track the allegations in the complaint herein.**

155.   A Motion for Summary Judgment, including a Concise Statement of Undisputed Facts, was filed by Lamancusa. (2:18-cv-1397, ECF Nos. 56-59). The Honorable Patricia L. Dodge of this Court issued a well-reasoned opinion setting forth findings of fact based upon the extensive record.   (2:18-cv-1397, ECF No. 70).

**Admitted.**

156.  This court found that Lamancusa had no involvement in Foley's CYS matter.  Id.

**Denied as stated.  The Court in that case determined that there was insufficient evidence pleaded by the Plaintiff to support a § 1983 claim.**

157.   This court found that Foley's son was not returned to her in exchange for testimony in a criminal case. Id. at p. 20.

**Denied as stated.  The Court in that case determined that there was insufficient evidence pleaded by the Plaintiff to support a § 1983 claim.**

158.   This Court found that Lamancusa's interactions with Foley did not relate to any seizure of property.  Id.

**Denied as stated.  The Court in that case determined that there was insufficient evidence pleaded by the Plaintiff to support a § 1983 claim.**

159.   This Court found that Lamancusa did not seek sexual favors

in exchange for resolving Foley's criminal charges. Id.

**Denied as stated.   While the Court declined supplemental jurisdiction to support Taylor Foley' §1983 claim, it remanded her assault and battery claim to state court.**

160.    Despite the dramatic allegations in the Second Amended Complaint, Taylor F. describes there being only three interactions with District Attorney Lamancusa – the one in 2014 in his office, another in his office in the summer of 2016 and the one at her home in January 2017. Ex. SS, Foley Depo Transcript at pp. 138-46, 170-86, 218-21.

**Denied as stated.  In addition to the three in person meetings, there were text messages and facebook messages between the Defendant Lamancusa and Taylor Foley that Lamancusa attempted to have Foley delete.  (Exhibit J, Foley deposition, Pages 198-202).**

161.    On November 15, 2013, when Taylor F. was a minor herself, she was with her son T.F. at an apartment  in the Loop Street projects with several of her acquaintances.  T.F. was less than four months old at the time.  Ex. SS, Foley Depo Transcript at pp. 37-39; Ex. TT, Foley Trial Transcript; Ex. UU, Nov. 2013 Records.

**Admitted.**

162.    While Foley served as a witness in this trial, District Attorney Lamancusa had no personal involvement in the prosecution of Leon Platt for the murder of Richard Hogue. Ex. SS, Foley Depo Transcript at pp. 61-62.

**Admitted.**

163.    Taylor Foley claims she went to Lamancusa's Office in 2014.

Taylor F. testified that Lamancusa asked her to be a confidential informant and said to her "if you help me, I'll help you." Taylor F. testified that Lamancusa told her that she was pretty and smart and did not need to be mixed up with people who were involved in a murder. Lamancusa touched her hair and ran his hands down her back. Foley then left his office. Lamancusa disputes this interaction. Ex. SS, Foley Depo Transcript at pp. 170-186; Ex. WW, County Defendants' CSMF - Foley.

**Admitted.**

164.   Foley did not meet with Lamancusa regarding the Platt matter. Ex. SS, Foley Depo Transcript at pp. 60-62.

**Admitted.**

165.   Lamancusa did not tell Taylor F. she could have her child back if she testified in the murder trial of Leon Platt. Ex. SS, Foley Depo Transcript at pp. 45-63.

**Admitted.**

166.   Taylor F. testified during the trial of Leon Platt for the murder of Richard Hogue on April 8, 2016. Ex. TT, Foley Trial Transcript.

**Admitted.**

167.   During the murder trial, Foley testified that she was not promised anything in return for her testimony.  Specifically, she testified that she was not promised anything relating to the CYS matter for her testimony. Ex. TT, Foley Trial Transcript at pp. 62, 81.

**Admitted.**

168.    On October 14, 2014, Foley had outstanding warrants in North Carolina and had to go take care of them. Ex. SS, Foley Depo Transcript at 75-76

**Admitted**

169.    In November 2014, Foley was incarcerated relating to a stabbing incident between her and Adam Pounds. Adam Pounds stabbed her. Ex. SS, Foley Depo Transcript at pp. 88, 103-05 ; Ex. VV, November 2014 Records.

**Denied. This statement of fact is not supported by the record.**

170.    In July 2016, Taylor F. pled guilty to disorderly conduct to the outstanding drug trafficking charges that were issued in February 2015. Ex. XX, Records from 2015.

**Admitted.**

171.    Consideration for Taylor F.'s cooperation in the murder trial was given for her sentencing on those charges and jail time was avoided. Ex. SS, Foley Depo Transcript at pp. 84-89; MARIA – SAME HERE, Ex. XX, Records from 2015.

**Admitted.**

172.    T.F. was returned to his mother's custody on October 12, 2016 pursuant to Court order, as the Court determined that T.F. met the service plan requirements at that point. Ex. YY, CYS Running Dictation at pp.

162, 166, 171.

**Admitted.**

173.    In the summer of 2016, Taylor F. went to Lamancusa's office to discuss the current status of her pending charges and probation. Ex. SS, Foley Depo Transcript at pp. 138-46.

**Admitted.**

174.    Taylor F. wanted to move to Louisiana with the father of her infant daughter, but was told by probation she could not move because her supervisor could not be transferred. Ex. SS, Foley Depo Transcript at pp. 138-46.

**Admitted.**

175.    Lamancusa agreed to drop charges against Taylor F. and release her from probation if she paid the fines. Ex. SS, Foley Depo Transcript at pp. 138-46.

**Admitted.**

176.    In January 2017, when no charges were pending against Foley, an interaction occurred between Foley and Lamancusa at Foley's parents' house. Lamancusa denies any physical contact. Ex. WW, County Defendants' CSMF – Foley matter.

**It is admitted that in early 2017 there was an interaction between Foley and the Defendant Lamancusa. Foley says there was physical contact. Lamancusa denies it.**

## PLAINTIFFS' COUNTER STATEMENT OF MATERIAL FACTS

### A.  Anna Russo and her "stuff"

### 1.  The Affidavit of Robert Luptak

1.     The Plaintiff Ann Russo owned ACRO Motors, an automobile dealership. In Edinburg, Pennsylvania  (Exhibit A Luptak Affidavit, , ¶ 1).

2.     Mr. Luptak was the manager of ACRO Motors and as such ran the business.   He also received authorization from the Plaintiff Anna Russo to make all purchases and to make strategic business investments.  (Exhibit A, ¶ 3).

3.     On October 23, 2014 Luptak was staying at 218 West Winter Avenue, New Castle, Pennsylvania a home owned by his mother, Anna Russo. (Exhibit A, ¶ 10).

4.     The home in question, 218 West Winter Avenue was the property of Mr. Luptak's grandparents prior to their deaths.  (Exhibit A, Luptak Affidavit, ¶ 11).

5.     It was Robert Luptak's responsibility to care for the property and all of the Russo family heirlooms, including valuable articles of property, cash and collectable coins.  (Exhibit A, Luptak Affidavit, ¶ 12).

### a.    *The Search of 218 West Winter Avenue by SIU*

6.     On October 23, 2014 a search was conducted at 218 West Winter Avenue.  Various items were seized regardless of who owned them or whether

they had any connection to any allegation of drug violations.  (Exhibit A, Luptak Affidavit, ¶ 13).

7.     Among items seized on October 23, 2014 were items owned by his mother's granddaughter including a three-wheeler, an iPad, peddle bike and a child's piggy bank containing money that was being saved for several years by Plaintiff Russo's granddaughter, Mr. Luptak's daughter.  (Exhibit A, Luptak Affidavit, ¶ 14).

8.     Present throughout the search was the Defendant Joshua Lamancusa who was at the scene assisting in the search.  (Exhibit A, Luptak Affidavit, ¶ 15).

### b.     The Witness Luptak's Arrest, Detention, and Interrogation

9.     Mr. Luptak, was arrested on October 23, 2014 on drug charges by the New Castle Police Department.   (Exhibit A, Luptak Affidavit, ¶ 16).

10.     Valuable articles of property were seized in the search conducted at this home at 218 Winter Avenue by police officers who were part of the enterprise, the SIU.  (Exhibit A, Luptak Affidavit, ¶ 17).

11.     Luptak, was kept in a questioning room for four hours before Officer Costa, then a member of the SIU brought the District Attorney, the Defendant to speak with him.  (Exhibit A, Luptak Affidavit, ¶ 18).

12.     At the interview, the Defendant Lamancusa, according to Luptak, called him the "kingpin of the New Castle Drug Trade" and wanted to know all

about drugs in New Castle.  (Exhibit A, Luptak Affidavit, ¶ 20).

13.    Luptak was not given Miranda warnings until after being questioned by the Defendant Lamancusa.  (Exhibit A, Luptak Affidavit, ¶ 21).

14.    After hours of questioning from the Defendant Lamancusa and officers participating in the SIU, Luptak did not make admissions.  (Exhibit A, Luptak Affidavit, ¶ 22).

15.    In the area where Luptak was questioned there were recording devices and a camera in the room.  These devices were not used to record the question and answer session conducted by the Defendant Lamancusa and the other representatives of the SIU.   (Exhibit A, Luptak Affidavit, ¶ 24).

16.    In the course of the interview, the Defendant Lamancusa referred to "stolen tools at the car lot of ACRO Motors".   (Exhibit A, Luptak Affidavit, ¶ 25).

17.    The Defendant Lamancusa asked Luptak if he had a problem with letting him "take a look around the car lot for stolen items".  (Exhibit A, Luptak Affidavit, ¶ 26).

18.    Luptak informed the Defendant Lamancusa he did not have the keys to get into the lot.  (Exhibit A, Luptak Affidavit, ¶ 27).

19.    At that point, members of the SIU, working with the Defendant Lamancusa responded that if he refused to give his consent to the search of the car lot that Lamancusa would "get a f---ing backhoe and knock down the fence and doors" once they obtained a search warrant.  (Exhibit A, Luptak

Affidavit, ¶ 28).

20.    Attempting to avoid the escalation of threats, Luptak signed the form that gave consent for the Defendant Lamancusa to search the car lot. (Exhibit A, Luptak Affidavit, ¶ 29).

### c.    The Search of ACRO Motors

21.    Members of the SIU executed a search of ACRO Motors on October 23, 2014 without talking to the Plaintiff Anna Russo prior to their arrival. (Exhibit A, Luptak Affidavit, ¶ 30).

22.    The Defendant Lamancusa never produced a search warrant for the Plaintiff Anna Russo.  (Exhibit A, Luptak Affidavit, ¶ 31).

23.    On the evening of October 23, 2014, Plaintiff Anna Russo went to the car lot and spoke with the Defendant Lamancusa who stated that he and the SIU had a warrant to be on the premises. (Exhibit A, Luptak Affidavit, ¶ 32).

24.    No warrant was given to the Plaintiff Anna Russo. (Exhibit A, Luptak Affidavit, ¶ 33).

25.    The Defendant Lamancusa, in his official capacity seized, among other things, the following: approximately fifteen vehicles, titles and deeds to the seized vehicles, titles and deeds to the other vehicles in possession of ACRO Motors; approximately $1,500 in petty cash, and other items of property belonging to ACRO Motors and Plaintiff Russo; $15,498 in bank wraps with time/date stamp and routing numbers that was drawn from ACRO Motors bank

account; large amount of jewelry valued at approximately up to $100,000; and other various items of property belonging to ACRO Motors and Plaintiff Russo. (Exhibit A, Luptak Affidavit, ¶ 34).

26.    The vehicles seized by the Defendant Lamancusa were among the most valuable vehicles in the possession of ACRO Motors. (Exhibit A, Luptak Affidavit, ¶ 35).

27.    None of these vehicles belonged to Luptak, nor were any of these vehicles implicated in any drug investigation. (Exhibit A, Luptak Affidavit, ¶ 36).

28.    In the course of the search, members of the SIU caused extensive damage to the Plaintiff Russo's dealership which included, to wit, among other things: they stomped on, dented and scratched the rooves and hoods of the vehicles; they ripped out doors, door panels and interiors of the cars; they destroyed a large safe; there was major damage to the property itself by use of heavy equipment which they claimed they were "digging for human remains" without any probable cause to believe there were any human remains on the premises. (Exhibit A, Luptak Affidavit, ¶ 37).

29.    The Honorable Dominic Motto ordered the Defendant Lamancusa to produce evidence for these actions but none was ever produced. (Exhibit A, Luptak Affidavit, ¶ 38).

### d. Robert Luptak's Second Encounter with the Defendant Lamancusa

30.     It is in this meeting that Lamancusa details the nature, extent and practice of his use of the SIU as a racketeering enterprise.  At the meeting, according to Luptak, the Defendant Lamancusa stated to him, "I have a proposition for you.   What if I made all charges disappear like they never happened?  Would you like that?   See I'm the guy that can make everything disappear with the push of a pen.  I will do this for you if you just let me keep everything we confiscated.   Why don't you jump onboard so I can welcome you to the family?  This is what we do."   (Exhibit A, Luptak Affidavit, ¶ 39).

31.     Luptak declined to accept Defendant Lamancusa's offer.   (Exhibit A, Luptak Affidavit, ¶ 40).

32.     Defendant Lamancusa explained that he wanted Luptak to plant drugs or other contraband so that it would appear that the drugs were in the possession of targeted individuals; to set someone up with a lot of assets, "not someone on the corner selling $20 rocks.   We want the big guys with wealth." (Exhibit A, Luptak Affidavit, ¶ 41).

33.     At this meeting that there were SIU members present with the Defendant Lamancusa and stated that they wanted Michael Mansour, the owner of a very large car lot very bad and Bryan Whiting as people the Defendant Lamancusa wanted Luptak to "set up".  (Exhibit A, Luptak Affidavit, ¶ 42).

34.   When Luptak questioned how he could set someone up if they weren't doing anything illegal, the response from a member of the SIU speaking in front of the Defendant Lamancusa was, "You let us worry about that." (Exhibit A, Luptak Affidavit, ¶ 43, 44).

35.   he was offered $100 in cash to make a "buy".  (Exhibit A, ¶ 45).

### e.   Robert Luptak's Third Encounter with the Defendant Lamancusa

36.   There was a third meeting on April 17, 2017.   Luptak was represented by counsel at that time but he met alone with the Defendant Lamancusa in Lamancusa's office.  (Exhibit A, ¶ 46).

37.   At this meeting Defendant Lamancusa told Luptak he would give him one week to decide what he wanted him to do has he handed Luptak his card with his direct dial number.   He stated, "If I don't hear from you I will take that as a no and then I will show you what will happen at trial."  (Exhibit A, Luptak Affidavit, ¶ 47).

38.   What happened at trial was that Luptak was convicted and was sentenced to 11 ½ to 23 years in prison. (Exhibit A, Luptak Affidavit¶ 48).

39.   The vehicles in question remained the possession of the District Attorney's Office through-out the investigation and prosecution. (Exhibit A, Luptak Affidavit, ¶ 49).

## 2.    Anna Russo's Version of the Events

### a.    Her stuff

40.    Mrs. Russo is 80 years old.  (Exhibit C, Russo deposition, Page 7).

41.    Anna Russo was the owner of ACRO Motors, and her son, Robert Luptak, mostly ran it.  He had no ownership interest.  (Exhibit C, Russo deposition, Page 13, 14).

42.    The cars in the ACRO lot were purchased at auction and they came with titles.  (Exhibit C, Russo deposition, Page 17, 18).

43.    Confiscated in the search of October 23, 2014 was Anna Russo's "So they took what was mine.  (Exhibit C, Russo deposition, Page 30).

### b.    The Search of ACRO Motors

44.    Anna Russo spoke to the Defendant Lamancusa on the day of the search.  She stated,

> "So, it my mind, I said, in other words, they were searching for a body.  So why did they wreck my place like they did? They stole stuff from us.  Why did they take all of the documents and stuff?  If you're searching for a body, then why did you wreck my whole business, my whole you know, office, everything."
> (Exhibit C, Russo deposition Page 102).

She went on to state the damage they had done.

> "Well, the damage, they destroyed the office.  They ripped out all of the surveillance cameras and stuff.  They took documents, papers, titled.  They destroyed completely my office.  The office is completely destroyed.  And they ripped everything out, you know, wherever they were looking."
> (Exhibit C, Russo deposition, Page 106).

45.     There was no business anymore.  It was destroyed.  (Exhibit C, Russo deposition, Page 107).

46.     Property was taken, not only at ACRO Motors but also at 218 West Winter Avenue.   Anna Russo stated that jewelry and coins were taken from the house.   Bonds were also taken.  She stated, "There was other stuff at that house that, you know, they took, a lot of stuff that I don't even know at this point.  I don't know exactly, because a lot of stuff my mother had over there.  It was my mother's stuff."  (Exhibit C, Russo deposition, Page 124).

47.     Anna Russo filed the lawsuit not only to get her items back, but also due to the pain and hardship caused to her family.

> "I'm not interested in just returning the  - of the stuff.
> It's got to be more than that, because there's a lot of
> damage done to me, my family, mentally, physically.
> We're still suffering.  And it's  - -like, its taken a toll on us.
> So somebody has to be accountable for whatever they
> caused, the pain and the hardship that it caused our family
> ……
>
> The whole thing that Josh did, the whole thing, that he
> destroyed my family, my business, everything that I tried
> to do for my children for living life, because I'm 80 years
> old.  And it's a lot of pain, a lot of suffering, hurt, a lot of
> damages physically, mentally, and everything else.
> (Exhibit C, Russo deposition, Page 133, 134).

48.     Things that were taken by the Defendant have never been returned to her.  As a result, her business ACRO Motors shut down and she has never been able to reopen it.   The used car lot is now filled with disabled vehicles that have sat there since October 23, 2014.    (Exhibit D, Russo Affidavit, ¶ 23, 24).

49.     Anna Russo cannot do anything with the vehicles because she doesn't have titles for them.   (Exhibit D, Russo Affidavit, ¶ 25).

50.     It was four years later before there was an attempt to return the seized vehicles to Anna Russo.   It cost her $500 to have them towed because "they were a piece of junk by that time."  (Exhibit C, Russo deposition, Page 70).

### B.    Torry Argiro – When Powder Coated Paint is Alleged to be Cocaine and Heroin.

#### 1.    Torry's Posting

51.     On August 26, 2019 the Plaintiff Argiro posted a political call to remove the Defendant Lamancusa from his office as a result of Lamancusa's corruption (Exhibit F, Argiro deposition, Page 138).  More specifically he stated the following:

> I'm going to need at least 50 signatures to bring a corrupt public official down and get rid of this cancer once and for all.  Enough bullshit warrants passed by corrupt judges, enough harassing those who are down just because they can't afford to pay you off like the others, enough bullying the people and the forceful nature of his band of abusers.  (Exhibit F, Argiro deposition, Page 139)

> He further stated:

> A.     It says: "I believe we should call an FBI investigation into these bullshit arrest warrants flying around New Castle.  Help us here in New Castle, PA, Mr. Trump."
>
>                              . . .

> B.     - - "bullshit arrest warrants flying around New Castle.
>
> HELP US HERE IN NEW CASTLE, PA, MR. TRUMP."  All caps. "OUR DA IS ABUSING WE THE PEOPLE."  All caps.

"It's un-American what's going on.  Innocents are suffering because instead of righting wrongs, our DA takes the abusive and easy way out and threatens to derail the innocent lives in order to make himself feel better."  (Exhibit F, Argiro deposition, Page 146, 147)

### 2.    The Walmart Incident – Defendant Lamancusa' s original search

52.    Plaintiff Argiro admitted that at the time of his arrest, he was a cocaine addict and his supplier was one Cassandra Welsh.  (Exhibit F, Argiro deposition, Page 153).

53.    He was at Walmart in the late night hours of August 28, 2019 and the early morning hours of August 29, 2019 with Cassandra Welsh and went inside.  When he came outside there was a Union Township Police Officer, Officer Wickline, and another officer surrounding his Jeep vehicle and they had in their hands paint powder coat which was in two separate bags.  (Exhibit F, Argiro deposition, Page 153).

54.    They asked Mr. Argiro what it was.  He said, "It's paint."  He said he was the head powder coater and it was in his Jeep because his oven at the house was down.  The paint powder was clearly labeled at that time.  (Exhibit F, Argiro deposition, Page 153).

55.    Cassandra Welsh informed him that she was working with someone at the DA's office, specifically the Defendant Lamancusa.  (Exhibit F, Argior deposition, Page 149).

56.    She had been charged with a substance which was in actuality baby powder but she was accused of it being drugs.  The charges were

eventually dropped because of her cooperation with the DA.  (Exhibit F, Argiro deposition, Page 149).

57.    Plaintiff Argiro was informed by Welsh that her cooperation with the District Attorney, the Defendant Lamancusa included sexual activity with the Defendant Lamancusa.  (Exhibit F, Argiro deposition, Page 151, 152).

58.    Welsh informed Plaintiff Argirio several days after the arrest that she performed this sexual activity with the Defendant Lamancusa to get out of jail.  (Exhibit F, Argiro deposition, Page 151).

### 3.    The Initial Encounter with Officer Wickline

59.    On the date of his initial arrest, there was a scale in the console of the Plaintiff Argiro's car. (Exhibit F, Argiro deposition, Page 174).

60.    The scale was placed there by Cassandra Welsh.  (Exhibit F, Argiro deposition, Page 172, 174).

61.    Plaintiff Argiro was then taken to the Union Township Police station.  He was questioned by Officer Thomas Wickline.  (Exhibit F, Argiro deposition, Page 176).

62.    Officer Wickline asked Plaintiff Argiro if he was a user or dealer. He said he was a user and that he needed help.  Officer Wickline responded that he would get him help but "I need you to write a name down."  (Exhibit F, Argiro deposition, Page 175, 176).

63.     He wrote down the name of the Defendant Joshua Lamancusa. (Exhibit F, Argiro deposition, Page 175, 176).

64.    Officer Wickline also had bags and asked Argiro, "What is this?" Argiro replied, "It's paint."  (Exhibit F, Argiro deposition, Page 176).

65.    The powder coat paint was seized by Officer Wickline.  One bag of the powder was listed as 932 grams of suspected cocaine.  The other bag was 740 grams of suspected heroin.  (Exhibit F, Argiro deposition, Page 178, 179).

66.    Plaintiff Argiro testified about observing the Defendant Lamancusa handing a bag to an individual named Caldararo who handed it to a man named Frankie who handed it to Argiro.  It contained a gram of cocaine. (Exhibit F, Argiro deposition, Page 193).

67.    After the Walmart incident and being questioned by Officer Wickline, he was taken home.  (Exhibit F, Argiro deposition, Page 67).

68.    Mr. Wickline at that time told the Plaintiff Argiro that if drugs were found in his vehicle, other than the paint, and if the paint NIK tested negative, "Then I will be fine and I will get my vehicle back."  (Exhibit F, Argiro deposition, Page 165).

**4.    The Ryhal Interview and Argiro's Arrest**

69.    Three days later he was arrested.  (Exhibit F, Argiro deposition, Page 67).

70.    Plaintiff Argiro had an encounter with Richard Ryhal of the SIU. Ryhal had informed him at that interview that he had NIK tested the pain and it tested positive.  Plaintiff Argiro knew that it was paint and it would not give a false positive.  (Exhibit F, Argiro deposition, Page 88).

71.     When Argiro walked into the room Ryhal read him his rights and had him initial and sign off.  Ryhal told him, "We NIK tested your paint, and it tested positive for cocaine."  Plaintiff Argiro responded, "Fifth Amendment, attorney, take me to jail.  You're a fucking liar.  That's when he went, whack."  (Exhibit F, Argiro deposition, Page 207).

72.     Ryhal bashed Plaintiff Argiro's face off the desk.  (Exhibit F, Argiro deposition, Page 207).

73.     Officer Wickline drafted an arrest warrant but it was dictated to him, "word for word" by the SIU member, Richard Ryhal."  (Exhibit F, Argiro deposition, Page 137).

74.     Attached as Exhibit "G", is a copy of the arrest warrant and criminal complaint.  The Criminal Complaint essentially has two discreet drug offenses.  The first two counts involve serious felonies involving Possession with Intent to Deliver, 932 grams of suspected cocaine and 740 gross grams of suspected heroin.  These two counts involved the paint powder of the Plaintiff Argiro.  Hereinafter they will be referred to as the "paint counts".  (Exhibit G, Argiro Criminal Complaint).

75.     The second two counts of the complaint go back to the initial encounter that the Plaintiff Argiro had with Officer Wickline.   The third count of the complaint refers to a plastic bag containing approximately one gram of suspected cocaine.   The fourth count involves possession of drug paraphernalia.  These are ungraded misdemeanors.  These two counts will be

referred to as the "paraphernalia counts".    (Exhibit G, Argiro Criminal Complaint).

76.    The "paint counts" and the "paraphernalia counts" are discreet and separate offenses.  (Exhibit G, Argiro Criminal Complaint).

77.    His bond was set at $100,000.  (Exhibit F, Argiro deposition, Page 220).

### 5.    Plaintiff Argiro's Petition for Reduction of Bond

78.    A Petition for reduction of bond was filed on September 18, 2019. (Exhibit "H").

79.    Defendant Lamancusa filed a "statement of the District Attorney" dated the following day and filed on September 23, 2019 opposing the bond reduction.  (Exhibit "I").

80.    In this statement the Defendant Lamancusa in his own handwriting wrote the following:

> "Defendant Argiro is a flight risk, a danger to our community Has significant mental health issues and is a drug addict.  He is facing significant felony charges and the U.S. Atty's office may supersede the case.  Additionally, there is no proof or evidence that the defendant is employed."
> (Exhibit "H", Statement of the District Attorney).

81.    At the bond hearing Argiro was informed by the Assistant District Attorney, Bill Flannary, that when the results came back from the crime, "it's just paint".  (Exhibit F, Argiro deposition, Page 212, 213).

82.　　A report from the crime lab dated November 4, 2019 indicated that the drug testing regarding the "paint counts" was "negative".　　Attached as Exhibit "O" is a copy of that report.

83.　　In spite of the fact that the District Attorney's office was well aware that the reason for the District Attorney's opposition to bond reduction was the "paint counts" and that the Pennsylvania crime lab had determined that the paint powder was in fact paint powder and not heroin or cocaine, the Commonwealth continued to pursue the "paint count" charges and Plaintiff Argiro's bond continued.　　(Exhibit F, Argiro deposition, Page 256).

84.　　Defendant Lamancusa concedes that the handwriting on Exhibit I, the "statement of the District Attorney") is his.　　(Exhibit B, Lamancusa deposition 1-27-25, Page 8).

85.　　Defendant Lamancusa was asked about his statement that Plaintiff Argiro was a flight risk and whether that was true.　　He said, "You know, looking at the charges now, yes, he would have been deemed a flight risk, giving the quantity of narcotics he had at the time of his arrest." (Exhibit B, Lamancusa deposition 1-27-25, Page 8,9).

86.　　With regard to his statement that the Plaintiff Argiro was facing significant felony charges, Defendant Lamancusa responded, "That's probably based on the charges with the weight of the drugs."　　(Exhibit B, Lamancusa deposition 1-27-25, Page 10).

87.　　With regard to the basis he had for the statement that the U.S.

Attorney's office may supersede the case, he said, "So this is common practice for us.  Every time we have a significant quantities of narcotics, we reach out to the US Attorney's office and oftentimes they supersede our indictment and take the case."  (Exhibit B, Lamancusa deposition 1-27-25, Page 11).

88.    The Plaintiff Argiro was frustrated with still being on house arrest. His credit suffered.   He couldn't work.   He couldn't find a job.   He was depressed.   (Exhibit F, Argiro deposition, Page 255, 256).

89.    They didn't dismiss the "paint count" charges until Argiro took the plea.  (Exhibit F, Argiro deposition, Page 151).

90.    This change of plea occurred in March of 2021. (Exhibit F, Argiro deposition, Page 242).

91.    The Plaintiff learned that the "paint count" charges would be dropped the day before he signed his plea. (Exhibit F, Argiro deposition, Page 231).

92.    Plaintiff Argiro pleaded guilty to .41 grams of cocaine, which was Count 3 of the Complaint.  This was after counsel told him that there was "construction possession".  (Exhibit F, Argiro deposition, Page 242).

93.    Plaintiff Argiro pleaded nolo contender to a witness intimidation charge which was added.  (Exhibit F, Argiro deposition, Page 243).

94.    The Plaintiff Argiro stated that the Defendant Lamancusa, "extorted me in the sense that I was going to go around and get signatures to bring in front of a judge the alleged corruption that was going on."  (Exhibit

F, Argiro deposition, Page 257).

95.   Argiro indicated that the Defendant Lamancusa filed charges against him to stop him from getting signatures.   When asked if he had evidence of this, he replied, "The time line."   (Exhibit F, Argiro deposition, Page 258).

### 5.   The Ryhal Award for Outstanding Service

96.   After the Plaintiff Argiro took the plea and that "paint counts" were dismissed, the Defendant Lamancusa gave Richard Ryhal an award "for outstanding service" for "saying my paint was drugs, was one of his major cases that year of his award".   (Exhibit F, Argiro deposition, Page 259).

### C.   Taylor Foley

### 1.   Taylor Foley is a Murder Witness and Loses Custody of her Son

97.   In November of 2013, when she was only 17 years old, Taylor Foley witnessed a murder committed by one Leon Platt.   (Exhibit J, Foley deposition, Page 37).

98.   She was questioned by the Ellwood City Police, beaten by them in front of her father, and taken to a juvenile detention facility.  (Exhibit J, Foley deposition, Page 37-41).

99.   Taylor Foley's son was removed from her custody by Lawrence County Children and Youth (CYS) and CYS representatives would not tell her

where he was.  (Exhibit J, Foley deposition, Page 45).

100.  Taylor Foley was told by CYS caseworkers that she would get him back if she testified.   She testified but did not get her son back.   (Exhibit J, Foley deposition, Page 44-45).

101.  Anytime Taylor Foley would ask any questions regarding  why her son was not returned to her, she was told by CYS caseworkers that they would have to call the District Attorney's office.  (Exhibit J, Foley deposition, Page 46).

102.  Taylor Foley did everything CYS told her to do.  Tom Minett, and whoever was with him, promised she would get her son back if she testified. (Exhibit J, Foley deposition, Page 55).

103.  CYS caseworkers always seemed to act like the matter was not in their control.   "They always made it seem like it was not - -it's not up to them… all they wanted me to do was cooperate.  My caseworkers could never tell me why I didn't have my child."  (Exhibit J, Foley deposition, Page 55).

104.  When asked who told her it was up to the District Attorney if she got her son back, her reply was, "Tom Minett, Thomas Minett; whoever the lady was, I think her name was Jessica; public defenders; Lamancusa; everyone; CYS.  CYS always told me they needed to - - they would contact the district attorney.  (Exhibit J, Foley deposition, Page 59).

2.    **Taylor Foley's meetings with the Defendant Lamanusa**

    *a. Meetings in the District Attorney's Office*

105. At some point Taylor Foley decided she wanted to move to Louisiana once she got her son back.  Probation told her they were not able to transfer her probation to Louisiana.  (Exhibit J, Foley deposition, Page 139).

106.  Taylor Foley went to speak with the Defendant Lamancusa to see if she could be removed from probation early.   (Exhibit J, Foley deposition, Page 141-144).

107.  When she was on house arrest, Taylor Foley was asked to go to the District Attorney's office.   Someone in the office took her cell phone before taking her into the Defendant's office.  (Exhibit J, Foley deposition, Page 165, 166).

108.  The Defendant Lamancusa offered her a cigarette and they went outside and smoked a cigarette outside of his office. (Exhibit J, Foley deposition, Page 171).

109.  When they returned to the Defendant's office he pulled out a DVD. The Defendant told Tayor that it was a video of her selling weed, or "something like that".  (Exhibit J, Foley deposition, Page 172).

110. Taylor Foley believed the Defendant wanted her to be in informant.   "I was under the impression at that moment that he – like, I thought he was showing me it and, like letting me know that he has that against me, and was wanting me to be an informant to, like make it go away.

That's what I thought."  He said he would "help her out".    (Exhibit J, Foley deposition, Page 171-179).

111.  The Defendant Lamancusa indicated that if Taylor Foley helped him out, he would help her out.   The Defendant was also complementing Ms. Foley.   "He said that I'm smart, pretty.  What else?  I'm trying to remember the exact words.   I believe he said I was conniving." (Exhibit J, Foley deposition, Page 180).

112.  "He was talking about the informant thing, and he was talking about some of the arrests he made, and the people in my life.  He wanted me to help him so he could help me, was complementing me – complimenting me, sorry, and yeah, and then he was making sexual advances." (Exhibit J, Foley deposition, Page 181, 182).

### b.    The Meeting at Taylor Foley's Home

113.  In early 2017, the Defendant Lamancusa came to Taylor Foley's home at approximately 2:00 a.m.   (Exhibit J, Foley deposition, Page 187).

114.  Taylor Foley's parents and her children were in the home sleeping.  Taylor was there with her friend Greg Rizotti.  The  two were talking after her parents went to sleep.   (Exhibit J, Foley deposition, Page 187-188).

115.  The Defendant popped up on Taylor Foley's Facebook messenger. (Exhibit J, Foley deposition, Page 188).

116.  Taylor Foley told Rizotti that the Defendant would watch her live Facebook videos.   She told Rizotti how the Defendant called her from two

random numbers and told her that if she didn't delete the Facebook messages between them he had a way of going in and doing it himself.   (Exhibit J, Foley deposition, Page 187-189).

117.   While Rizotti was at her house Ms. Foley received a message from the Defendant asking her where she was.   Foley said she was home.   The Defendant asked for her address.   (Exhibit J, Foley deposition, Page 199).

118.  Shortly after the Defendant arrived at her home in a black SUV with tinted windows. (Exhibit J, Foley deposition, Page 200).

119.  Taylor Foley went outside to talk to the Defendant and Rizotti hid in one of the bedrooms where her children were sleeping.  (Exhibit J, Foley deposition, Page 200, 201).

120.  When the Defendant entered the home he told Taylor Foley the first thing he needed her to do was erase those messages.  He then asked her where the bedrooms were like he wanted to go to the bedroom.  (Exhibit J, Foley deposition, Page 202, 203).

121.  Taylor told the Defendant they couldn't go to the bedroom because her parents were in one and her children were in one. (Exhibit J, Foley deposition, Page 203).

122.  Rizotti was texting Taylor, "I can't believe – get him out of here." (Exhibit J, Foley deposition, Page 203).

123.  According to Ms. Foley, The Defendant was "Kissing me, and starting kissing me down, and he was kissing, like my inner thigh, and I was

like, 'Oh, I think I hear my daughter,' and then I got up and went and woke her up on purpose and brought her out and was sitting on the couch and holding her, and he said she was cute, and I was like ,"oh, she's sick,' and then it got awkward. And then he said basically 'maybe next time' and he took two cigarettes and said, 'Mind if I take two cigarettes,' and he took two cigarettes, then he left."  (Exhibit J, Foley deposition, Page 204).

124.  Taylor said the Defendant touched her from her head down to her legs, touching her buttocks.  (Exhibit J, Foley deposition, Page 242).

125.  The Defendant and Taylor Foley also exchanged numerous text messages during this time frame. (Exhibit J, Foley deposition, Page 244).   A copy of these messages are attached as Exhibit K.

### 3.    The Defendant does not Dispute his presence at the Foley Residence

126.  When questioned about the events of the night in question in 2017, the Defendant did not dispute the fact that he was at the residence of parents of Taylor Foley.   "This would have been sometime in 2017, maybe January – early 2017….. At then at some point, I sent her a message.   I was in Ellwood City, and she, you know, asked me what I was doing…. She told me she was at her parent's house….So she sent me that address, and then I went over."  (Exhibit L, Lamancusa deposition, 3-4-20, Page 20).

127.  According to Lamancusa, he went to the house late in the evening, maybe 12:00. (Exhibit L, Lamancusa deposition, 3-4-20, Page 21).

D.    **The Bryan Whiting Matter**

1.    **The Formation of Whiting Roll-Offs, LLC and the Inclusion  of James Mims and Allen Porter in its Ownership**

128.  Bryan Whiting started a company known as Whiting Roll-Offs, LLC in approximately 2005.  (Exhibit M, Whiting deposition, Page 74,75).

129.   This company had roll off dumpsters and placed them for people's use at various sites.  (Exhibit M, Whiting deposition, Page 74).

130.  In 2015, Bryan Whiting sold 50% of the company to James Mims and Allen Porter, 25% to Mr. Mims and 25% to Mr. Porter.  (Exhibit M, Whiting deposition, Page 74).

131.  Bryan Whiting was involved in a car accident and as he put it, "I couldn't keep up, and some financial reasons."  For this reason, he sold the 50% of the company to Mr. Mims and Mr. Porter.   (Exhibit M, Whiting deposition, Page 77).

132.   Whiting maintained an active role in the company after November of 2015.  He dispatched, collected money and was involved in some operations of the scheduling of the dumpsters.   (Exhibit M, Whiting deposition, Page 85, 86).

133.   At some point Whiting became aware that Mr. Mims and Mr. Porter were concerned about his activities in the corporation and raised questions to the District Attorney about it.   (Exhibit M, Whiting deposition, Page 86).

134.  Mr. Mims indicated that  Mr. Porter had gone to the District

Attorney and took paperwork to the District Attorney.  (Exhibit M, Whiting deposition, Page 86).

135.  Whiting had no problem with this because, "I wasn't doing anything wrong."  (Exhibit M, Whiting deposition, Page 87).

136.  There had been daily threats made by Mr. Mims to him.  (Exhibit M, Whiting deposition, Page 73).

### 2.    The Lamancusa Meeting

137.  A meeting was schedule with District Attorney Lamancusa concerning the issues raised by Mr. Mims  and Mr. Porter.  (Exhibit M, Whiting deposition, Page 86).

138.  Present at the meeting was Mr. Mims, Mr. Porter, Tony Carbone, Attorney Medure and Bryan Whiting.   Attorney Lamancusa was there, "On behalf of Mr. Mims and Mr. Porter."  Mr. Lamancusa was friends with Mr. Mims and Mr. Porter and he held the meeting.  Mr. Mims and Mr. Porter did not have a lawyer with them.   (Exhibit M, Whiting deposition, Page 89).

139.  The allegation made by Mr. Mims and Porter was that Bryan Whiting was taking money or stealing money from the business.  (Exhibit M, Whiting deposition, Page 93).

140.  Whiting's position was that he had been instructed by Mims and Porter to pay certain items that were not in the corporation's records.  For example Whiting was paying some of the drivers cash over a six month period. (Exhibit M, Whiting deposition, Page 94,95).

141.  Mims and Porter had agreed to that.    (Exhibit M, Whiting deposition, Page 95).

142.  Mr. Lamancusa invited Tony Carbone to the meeting.    (Exhibit M, Whiting deposition, Page 97).

143.  Josh Lamancusa reached out to Carbone to interview him about an agreement whereby Whiting would sell his share of the business to Carbone.  (Exhibit M, Whiting deposition, Page 98).

144.  There was a discussion that if the ownership interest between Whiting and his two partners, Mims and Porter, were adjusted there would be no criminal charges.  Whiting took that to be a threat.    (Exhibit M, Whiting deposition, Page 104, 105).

145.  According to Whiting, "Josh was writing figures and Jim were writing figures and figuring out when we were all sitting at the table and breaking down the shares or whatever.  I don't know the exact conversation, but I know Josh had said, if you guys all agree we go to a third partner, that stack of paper would go in the shredder." (Exhibit M, Whiting deposition, Page 108,109).

146.  Tony Carbone, the individual whom Lamancusa had a contractual arrangement to purchase Whiting's share of the corporation, was kicked out of the meeting by the Defendant Lamancusa. (Exhibit M, Whiting deposition, Page 109).

147.  Whiting then transferred his stock to his wife, Michelle Whiting,

"So she could be a partner and she was supposed to be basically, like, a silent partner and collect the cash, check.  That was because I couldn't handle the stress and the – everything anymore."   (Exhibit M, Whiting deposition, Page 130).

### 3.    Bryan Whiting's Arrest

148.  There was an investigation by police at Hudson Suites, a hotel owned by Bryan Whiting.  (Exhibit M, Whiting deposition, Page 141).

149.  The investigation was by the SIU, the drug task force.  Present were Michael Mrozek, Tommy Costa, Chris Bouye and Officer Mangino.  (Exhibit M, Whiting deposition, Page 143-144).

150.  Detective Ryhal arrested Bryan Whiting.  At the direction of the Defendant Lamancusa they took him down to the station and Defendant Lamancusa would be down there to deal with him.   (Exhibit M, Whiting deposition, Page 149, 150).

151.  Whiting was taken to a holding cell to wait for the Defendant Lamancusa to arrive.  (Exhibit M, Whiting deposition, Page 151).

152. Defendant Lamancusa told Whiting that the ball was in Lamancusa's court.   He said Whiting could call any attorney from New Castle to Pittsburgh and that Lamancusa had absolute immunity.  (Exhibit M, Whiting deposition, Page 152).

153.  Defendant Lamancusa told Whiting if he didn't cooperate he was going to go to jail and that Defendant Lamancusa had the final decision.

(Exhibit M, Whiting deposition, Page 152).

154.   Defendant Lamancusa then left.   Whiting was interviewed by Mrozek, Costa and Bouye who wanted Whiting to set up surveillance in the hotel so they could bust people.   Whiting refused.   Whiting said the officers were to call the Defendant Lamancusa and tell him if Whiting went home or not.   (Exhibit M, Whiting deposition, Page 154-156).

### E.   **Michelle Whiting**

155.   Michelle Whiting, Bryan Whiting's wife, became aware of a meeting in March of 2017 with the  District Attorney Lamancusa about Whiting Roll-Offs. (Exhibit N, Michelle Whiting deposition, Page 14).

156.   It was her understanding that Bryan was accused of taking money from the business and the Defendant Lamancusa, Mr. Mims and Mr. Porter wanted him to get rid of some of his shares or go to jail. (Exhibit N, Michelle Whiting deposition, Page 15).

157.   Bryan Whiting ended up getting a little bit less of his shares, and then they wanted him to be out of the business completely and asked for her to be the partner.  (Exhibit N, Michelle Whiting deposition, Page 15).

158.   The threat against Bryan Whiting was that if he wasn't out of the business they would have him charged for taking money.  (Exhibit N, Michelle Whiting deposition, Page 16).

159.   Furthermore, she had to take the shares.    (Exhibit N, Michelle Whiting deposition, Page 16).

160.  There were constant meetings and that she either had to come up with more money, or lose more shares of the business to cover a debt of Bryan's.   If she didn't pay it, Bryan would be charged.   Any time there was a meeting, there was to be more money from Michelle Whiting.   (Exhibit N, Michelle Whiting deposition, Page 18).

161.  The contract that was signed when she became a partner valued her one share of the business at $165,000. (Exhibit N, Michelle Whiting deposition, Page 19).

162.  Michelle Whiting testified that she sold her one share valued at $165,000 to Mims and Porter for $10,000.  "It was come up with $10,000 or take the $10,000 and be gone."  (Exhibit N, Michelle Whiting deposition, Page 87).

163.  Officer Wickline told Torry Argiro that he would get him help but "I need you to write a name down."  He was to write the name of a drug dealer.  (Exhibit F, Argiro deposition, Page 192).

164.  Mims and Porter brought documents to the meeting at Defendant Lamancusa's office, as did Mr. Whiting.  (Exhibit M, Whiting deposition, Page 104).

165.  At the meeting in Lamancusa's office, Mr. Lamancusa told Whiting what he thought about the papers that Mr. Mims and Mr. Porter gave him and the papers that Mr. Whiting gave him:

> Q.    Okay.  Did Mr. Lamancusa tell  you what he thought about

the papers that Mr. Mims and Porter gave him and that papers that you gave him?

A.    He thanked me.

Q.    Thanked you for what?

A.    All the evidence that he needed to file charges.

Q.    So did you take that to mean that he believed the evidence that was provided to him supported the basis for charges?

A.    No.

Q.    Why not.

A.    I believe it was extortion to get Mims and Porter as sole owners.

(Exhibit M, Whiting deposition, Page 105).

Respectfully submitted,

THE LINDSAY LAW FIRM, P.C.

*s/ Alexander H. Lindsay, Jr.*
Alexander H. Lindsay, Jr., Esquire
Attorney for Plaintiffs
Pa. Supreme Court ID. No. 15088

110 East Diamond Street, Suite 301
Butler, Pennsylvania 16001
Phone:  (724)282-6600
Fax:  (724)282-2672
al.lindsay186@gmail.com
audrey@lindsaylawfirm.com